## IN THE CIRCUIT COURT
## FOR BALTIMORE COUNTY

**SANDRA MOYER**
53258-1 Painted Canyon
Fort Hood, TX 76544

**RICHARD MARTIN**
1104 Lucabaugh Mill Road
Westminster, MD 21157

**TERRY PATTERSON, Jr**.
3458 Millers Station Road
Manchester, MD 21102

and

**YVONNE MATHEWS**
3102 Barclay Street
Baltimore MD 21218

*Plaintiffs,*

v.

**HOME POINT FINANCIAL
CORPORATION f/k/a MAVERICK
FUNDING CORPORATION**
1194 Oak Valley Drive, Suite 80
Ann Arbor, MI 48108

<u>Serve on:</u> CSC-Lawyers Incorporating Service
Company, Resident Agent
7 St. Paul Street, Suite 820
Baltimore, MD 21202

*Defendant.*

Civil Action No.: C-03-CV-20-003899

## <u>CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiffs, Sandra Moyer, Richard Martin, Terry Patterson, Jr., and Yvonne Mathews, by

through their attorneys Michael Paul Smith and Melissa L. English of Smith, Gildea & Schmidt,

LLC, file this Class Action Complaint on behalf of themselves and the entire class of persons

similarly situated, suing the Defendant for cause and damages, and state as follows:

## INTRODUCTION

1.    Plaintiffs, Sandra Moyer, Richard Martin, Terry Patterson, Jr., Yvonne Mathews (collectively, "Plaintiffs"), and the alleged Class Members are borrowers who currently have or had a residential mortgage loan originated and/or brokered by Defendant Home Point Financial Corporation ("Home Point"), formerly known as Maverick Corporation, which was or is secured by Plaintiffs' and Class Members' residential real properties.

2.    Plaintiffs and alleged Class Members are victims of an illegal kickback scheme between Home Point and All Star Title, Inc. ("All Star"), a Maryland based title and settlement services company.

3.    Under the kickback scheme, Home Point's loan officers, agents, and/or other employees received and accepted illegal kickbacks from All Star in exchange for the assignment and referral of residential mortgage loans, refinances, and reverse mortgages to All Star for title and settlement services, in violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607(a).

4.    Home Point and All Star laundered the kickbacks through third-party marketing companies to conceal the illegal kickbacks and the kickback scheme.

5.    To pay for the kickbacks, Home Point and All Star charged Home Point borrowers fraudulent and unnecessarily increased charges for title and settlement services.

6.    Home Point and All Star fraudulently concealed the illegal kickbacks and kickback scheme by laundering the kickbacks through third-party marketing companies, falsely allocating title and settlement fees to manipulate the Annual Percentage Rate ("APR") on Home Point's loans, and making fraudulent representations on borrowers' loan documents. These concealments prevented borrowers, regulators, and auditors from discovering the illegal

kickbacks and kickback scheme and Plaintiffs' injuries, resulting therefrom, and allowed the kickbacks and unnecessarily increased fees to continue.

## PARTIES

7. Pursuant to Md. Rule 2-231, Plaintiffs bring this action as a class action on their own behalf and on behalf of the entire class of people similarly situated.

8. Plaintiff Sandra Moyer is a resident of Maryland and Texas.

9. Plaintiff Richard Martin is a resident of Carroll County, Maryland.

10. Plaintiff Terry Patterson, Jr., is a resident of Carroll County, Maryland.

11. Plaintiff Yvonne Mathews is a resident of Baltimore City, Maryland.

12. Defendant Home Point Financial Corporation is a New Jersey corporation, formerly known as Maverick Corporation, with its principal place of business in Ann Arbor, Michigan. Home Point is a foreign corporation qualified to and doing business in Maryland as a mortgage broker originating and/or lending consumer mortgage loans in Maryland and other states.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to Md. Code Ann., Cts. & Jud. Proc. § 4-402(d)(1)(ii).

14. This Court has personal jurisdiction over the parties. This Court has personal jurisdiction over Defendant Home Point because, during the time period alleged herein, Maverick continuously transacted business in Maryland and engaged in an illegal Kickback Agreement associated with prices charged by All Star for title and settlement services that are directed at, and have the intended effect of causing injury to, persons residing in or located in Maryland. *See* Md. Code Ann., Cts. & Jud. Proc. § 6-103.

3

15.     Venue is proper in this Court pursuant to Md. Code Ann., Cts. & Jud. Proc. §§ 6-201(a), 202(3).

### FACTUAL ALLEGATIONS FOR INDIVIDUAL AND CLASS RELIEF

16.     At all relevant times, All Star is a Maryland corporation and a licensed title and settlement services provider, licensed in Maryland and regulated by the Maryland Insurance Administration. All Star is licensed in more than thirty states and provides title and settlement services on residential mortgage loans, refinances, and reverse mortgages.

I.      **The All Star Scheme**

        **A. All Star and Participating Lenders pay and receive kickbacks in exchange for the assignment and referral of residential mortgage loans to All Star.**

17.     Beginning by at least 2008, All Star designs and executes a scheme with various mortgage lenders, and their brokers, loan officers, and other employees ("Participating Lenders"), to pay kickbacks in exchange for the assignment and referral of residential mortgage loans, refinances, and reverse mortgages to All Star for title and settlement services ("Kickback Agreement").

18.     As an integral part of the All Star Scheme, All Star and the Participating Lenders launder the kickbacks through a third-party marketing company.

19.     All Star does not regularly use third-party marketing companies for marketing services nor directly solicit borrowers. In contrast, the Participating Lenders and/or their branch managers, mortgage brokers, loan officers, and/or other employees frequently use third-party marketing companies to provide marketing services aimed at inducing borrowers to obtain residential mortgage loans, refinances, and reverse mortgages from that lender, such as a direct mail, data and/or leads lists, telemarketing, and/or live transfer leads providers.

4

20.     Under the Kickback Agreement, the Participating Lender identifies a third-party marketing company it uses for marketing services. All Star then makes the kickbacks to the third-party marketing company, which is applied as a credit toward the services the Participating Lender received, for the sole benefit of the Participating Lender.

21.     All Star's kickback, laundered through the third-party marketing company, is expressly for that lender's benefit in exchange for loan referrals under the Kickback Agreement. The kickback is not in exchange for any legitimate marketing services; in fact, All Star receives no marketing services from the third-party marketing company.

22.     To fund the kickbacks and ensure their continuation, All Star, and the Participating Lender, agree to overcharge borrowers for title and settlement services on loans referred to All Star for title and settlement services under the Kickback Agreement. Specifically, All Star and the Participating Lender agree to charge borrowers amounts unassociated with any legitimate title or settlement services, imposed solely to pay for the illegal kickbacks.

23.     The Participating Lender causes direct mail pieces to be issued, such as postcards, letters, "SNAP Packs" (mailers with perforated edges the recipient rips or "snaps" open), and other printed material, that encourage borrowers to contact the lender to apply for a residential mortgage loan, refinance, or reverse mortgage.

24.     Sometimes, the Participating Lender chooses to use the kickbacks to purchase telemarketing or "live transfer" calls. A borrower calls a centralized call center and the third-party marketing company transfers the borrower to the Participating Lender.

25.     These solicitation techniques, coupled with the Participating Lender's loan referrals to All Star pursuant to the Kickback Agreement, lure thousands of borrowers into the All Star Scheme.

**B.      All Star and the Participating Lenders use a web of concealments to hide the kickbacks, overcharges, and All Star Scheme from borrowers, regulators, and auditors.**

26.     Concealing the kickbacks from borrowers, regulators, and auditors, through a variety of tactics, is essential to the success and continuation of the illegal Kickback Agreement.

27.     Laundering the kickbacks through third-party marketing companies allows All Star and the Participating Lenders to conceal the existence and the amount of the kickbacks from borrowers, regulators, and law enforcement. All Star and the Participating Lenders launder the kickbacks through third-party marketing companies to also hide that anything of value is exchanged between All Star and the Participating Lender.

28.     All Star and the Participating Lender launder the kickbacks through the third-party marketing companies to conceal the fact that the payments are actually illegal kickbacks and to create the false impression that All Star is making payments for legitimate marketing services. In fact, however, All Star does not receive any legitimate marketing services from the third-party marketing companies laundering the kickbacks. To be clear, All Star's payments are always intended to serve as kickbacks in exchange for loan referrals, and not for any goods given to or services performed for All Star.

29.     To even further conceal the kickbacks and the All Star Scheme, All Star and the Participating Lender cause the third-party marketing company to create sham invoices to create the false impression that All Star pays for, and receives, legitimate marketing services from the third-party marketing company. Again, All Star does not receive any legitimate marketing services from the marketing company, and All Star's kickback was applied solely for the benefit of the Participating Lender.

30.     To conceal the Kickback Agreement and All Star Scheme from borrowers, All Star and that lender make fraudulent representations on loan documents, including the Truth in Lending Act ("TILA") Disclosure, the "Good Faith" Estimate, and the HUD-1.

31.     Additionally, All Star, and the Participating Lender, agree to not identify the amounts associated with the illegal kickback on any of the loan documents, including government mandated disclosure forms such as the "Good Faith" Estimate and HUD-1.

   **C.     All Star and the Participating Lenders erect an elaborate co-marketing sham, but All Star receives no marketing benefit and the payments are solely in exchange for loan assignments and referrals.**

32.     To add yet another layer of concealment, All Star and the Participating Lenders create the elaborate façade that All Star and that lender are engaging in legitimate "co-marketing". In furtherance of this sham, All Star and the Participating Lender agree to nominally include the All Star name or logo on direct mail solicitations sent to borrowers. These solicitations are a sham and fraudulent, because, with All Star's assent, the Participating Lender have its third-party marketing company design the mailers in such a way that the prospective borrowers will only contact the lender instead of All Star. For example, the mailer omits any phone number, website, or contact information for All Star, and only provides a phone number for the lender, eliminating any chance a borrower could contact All Star instead.

33.     The prototype for the "co-marketing" sham was developed by a postcard company contracted by All Star.  In an email about the mailer designs the postcard company advises:

   We played around with the design a bit and what we're running into is that if we use 25-50% of the card with All Star Title's info, it makes it confusing for the person receiving the card as they can't tell who the advertisement is from. We came up with a mockup with a smaller All Star Title logo so that it doesn't totally distract from the mortgage company's information. We also removed your phone

> number because we don't want people to call you instead of the
> mortgage company.

*See* Ex. 1, September 28, 2009 emails. In 2010, All Star notifies the postcard company,
"[w]e actually started a similar program with other direct mail companies and it[']s going
really[,] really well." *Id.*

34. By design, All Star receives no actual marketing benefit from the solicitation and the entire
    marketing benefit flows to the Participating Lender. In exchange, the Participating Lender
    agrees to refer all loans generated by the mailer to All Star.

35. Further, as demonstrated by All Star's early prototype, All Star and the Participating
    Lenders limit All Star to a negligible presence on the solicitation, with All Star's
    information occupying less than 1/5 of the surface area of a solicitation. *See* Ex. 2, Sham
    Mailer Exemplar. Consequently, All Star's payment to the third-party marketing company
    on behalf of the Participating Lender is disproportionate to the amount of space All Star's
    information occupies on the mailer. Thus, the inclusion of All Star on any material at all is
    solely to conceal the kickbacks and create the false appearance of a co-marketing initiative.

36. Despite paying millions of dollars in marketing credits to lenders, All Star never receives
    any marketing benefit from the sham solicitations and never receives a single call from a
    borrower resulting from those fraudulent mailers. All of All Star's business flows from
    loan referrals received from the Participating Lender that is subject to the Kickback
    Agreement.

37. The Consumer Financial Protection Board (CFPB), the federal agency responsible for
    RESPA enforcement, has identified that during the applicable time period of the Kickback
    Agreement, sham "co-marketing" agreements were so prevalent, that the CFPB issued a

compliance bulletin concluding that "many [marketing service agreements were] designed to evade RESPA's prohibition on the payment and acceptance of kickbacks and referral fees." Consumer Fin. Prot. Bureau, *CFB Compliance Bulletin 2015-05* (Oct. 8, 2015), https://files.consumerfinance.gov/f/201510_cfpb_compliance-bulletin-2015-05-respa-compliance-and-marketing-services-agreements.pdf.

38.     In describing the type of agreements that are used as fronts to hide illegal kickbacks, the CFPB details an illegal business practice virtually indistinguishable from the Kickback Agreement:

> [I]n another matter that resulted in an enforcement action, **a title company entered into unwritten agreements with individual loan officers in which it paid for the referrals by defraying the loan officers' marketing expenses.** The title company supplied loan officers with valuable lead information and marketing materials. In exchange, the loan officers sent referrals to the title company. The lenders did not detect these RESPA violations and/or correct or prevent them, even when they had reason to know that the title company was defraying the marketing expenses of the lenders and their loan officers.

*Id.* (emphasis added).

39.     While building the sham of "co-marketing," All Star makes clear to the Participating Lender that the payment to the Participating Lender is solely in exchange for the assignment and referral of loans for title and settlement services and attaches a production goal – referred to as a "unit goal" – to each kickback paid to a Participating Lender. As Jason Horwitz, the President and owner of All Star and the architect of the Kickback Agreement, describes it:

> the "unit goal" can be met with closings from the mail, or any other source. It doesn't matter where it[']s from, as long as we hit that unit number. Basically the agreement would be that we do not contribute to another campaign until we hit that unit goal.

*See* Ex. 3, June 22, 2011 email.

40.    All Star and the Participating Lenders perform the "unit goal" requirements of the Kickback Agreement with All Star paying kickbacks only after requiring a Participating Lender to document the number and value of the loans assigned and referred to All Star under the Kickback Agreement since the last kickback payment, and, on more than one occasion, leaving Horwitz to lay down the law:

> **"Ok. Just so we're clear, I'm not dropping $1 more until we close 25 NEW loans."**

*See* Ex. 4, February 6, 2013 email. Similarly, Horwitz clearly explains the marketing is for the Participating Lender – "for them", not All Star – and what All Star is paying for is the assignment and referral of loans from the Participating Lender.

| | |
|---|---|
| **From:** | Jason |
| **Sent:** | Monday, October 11, 2010 2:48 PM EDT |
| **To:** | FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=Rob |
| **Subject:** | RE: Marketing |
| **Attachments:** | image001.jpg, image002.jpg, image003.jpg |

i dont give a fuck if the mailer bombed - just a heads up, I'm doing 4 drops for him, thats it, and getting the 12 deals.  If they bitch about it or dont hold up to their end, i might be done doing marketing for them altogether

**From:** Rob Selznick
**Sent:** Monday, October 11, 2010 2:46 PM
**To:** Jason
**Subject:** FW: Marketing

Ex. 5, Oct. 11, 2010 Email between All Star Owner J. Horwitz and All Star Marketing Manager R. Selznick.

**II.    By 2014, Home Point and All Star begin performing the Kickback Agreement and All Star Scheme.**

41.　At all relevant times, the Home Point branch managers and loan officers that participate in the Kickback Agreement are licensed mortgage brokers and/or authorized loan officers and are acting within the scope of their employment and duties. Specifically, these branch managers, loan officers, and employees seek to acquire new business by selling, brokering, originating, and/or securing loans for residential mortgages for new and existing loan borrowers. All activities, including any interaction with All Star, are for the benefit of Home Point.

42.　During the relevant time period, Home Point employs as loan officers and/or branch managers: Ami Desai, Alex Mavroulis, Ron Riccatelli, Maria Filipou, Roald Sebeck, Sr., Anthony Miller, John Sebeck, Thomas Bowen, Jason Filipou, Joanne Sebeck, Kristian Kanas, Steve Adelman, Ryan Huebel, Kristin Jourdan, Melissa Farrell, Karen Krane, Michelle Hewit, Robert Howell, Heather Rao, Kent Bostic, Max Spitalny, Michael Mason, Carolyn Maas, April Kramer, Jim Metz, John Ranocchia, Michael Winberly, Josh Barlow, Tracy Mahon, Michael Marcellino, Christy Hansen, Larry Schultz, Mark Kassouf, Michael Balzano, Raymond Notaro, Angela Sheeler, Brian Brockmyer, Dom Notaro, Headley Roase, John Fato, and Josh Jannery.

43.　By 2014, Home Point enters a Kickback Agreement with All Star and agrees to receive and accept kickbacks from All Star as a quid pro quo for assigning and referring Home Point residential mortgage loans, refinances, and reverse mortgages to All Star for title and settlement services.

44. These kickbacks are laundered through various third-party marketing companies, including L.B.E. Data also known as Viatele DE Corp (":BE/Viatele"), MISTid Marketing LLC ("MISTid"), and Influence Direct ("Influence").

45. On May 30, 2014, Ami Desai, a Sales Manager employed by Home Point, sends Dan Hart, a national marketing representative for All Star, and John Sebeck, a Home Point branch manager, an email setting forth the Home Point loans she has referred to All Star and, in exchange, asking All Star for kickbacks. Ex. 6, May 30, 2014 Email. Hart agrees and responds by setting up a meeting with Desai and Sebeck. Ex. 7, June 4, 2014 Email.

46. In June 2014, Home Point assigns and refers 3 Home Point loans to All Star for title and settlement services in performance of the Kickback Agreement, all from the Home Point branch where Desai and Sebeck are employed.

47. The next month, Desai again emails All Star marketing representative Dan Hart (copying Home Point Branch Manager John Sebeck) inquiring about more kickbacks for the assignment and referral of Home Point loans to All Star.

48. The kickback is designed to be laundered through LBE/Viatele. Ex. 8, July 9, 2014 Email.

49. To conceal this kickback, All Star, instructs Desai to cause LBE/Viatele to create a sham split invoice so that All Star could launder the kickback through LBE/Viatele, and conceal that the payment is a kickback. Ex. 9, July 9, 2013 Email; Ex. 10, July 22, 2014 Email.

50. By August 2014, Home Point and All Star engage in a turn down kickback arrangement, within which Home Point loan officer Desai "kicks" a loan to Costal Lending Group ("Coastal") but insists on Coastal using All Star for title and settlement services. All Star, in turn, pays Home Point a kickback in exchange for the assignment and referral of the original Home Point, now Coastal, loan. Ex. 11, August 22, 2014 Email.

51.     Home Point also causes LBE/Viatele, a third-party marketing company, to issue split invoices. *See* Ex. 12, Viatele Invoice 1271, Ex. 13, Viatele Invoice 1273; Ex. 14, August 5, 2014 Email.

52.     These two invoices are a sham because they falsely represent that All Star receives 20 live transfer calls and 40 email leads from LBE/Viatele, but, in fact, All Star does not receive any marketing services from LBE/Viatele. All Star's payment is a kickback to Home Point for the referral of Home Point loans to All Star for title and settlement services.

53.     Home Point assigns and refers 9 Home Point loans to All Star for title and settlement services in July and August, 2014 in performance of the Kickback Agreement.

54.     As part of the All Star Scheme and Kickback Agreement, in September 2014, Home Point assigns and refers 11 Home Point loans to All Star for title and settlement services.

55.     By October 3, 2014, All Star, by and through national marketing representative Dan Hart, highlights the importance of maintaining accurate records of the kickbacks – and resulting loan referrals from Home Point - to ensure that Home Point and All Star are maintaining the "unit goal" of the Kickback Agreement and that the fees charged on the loans assigned and referred to All Star under the Kickback Agreement are high enough to fund the illegal kickbacks. Ex. 15, October 3, 2014 Email.

56.     On October 14, 2014, All Star national marketing representative Dan Hart emails Desai to obtain a list of Home Point loan officers in the Sebeck Home Point branch referring loans to All Star in performance of the Kickback Agreement. Ex. 16, October 14, 2014 Email.

57.     In an October 17, 2014 email, All Star Marketing Representatives Dan Hart and Rob Selznick and All Star President Jason Horwitz, discuss the kickbacks, co-marketing sham, unnecessarily increased pricing, and unit goals applicable under the Kickback Agreement

across multiple Home Point branches. Ex. 17, October 17, 2014 Email. All Star marketing representatives further identify the kickbacks they pay to various Home Point branches in an email two weeks later. Ex. 18, October 30, 2014 Email.

58.  All Star Marketing Representative Dan Hart is explicit about the kickbacks he pays Home Point:

---

**From:** Dan Hart
**Sent:** Thursday, October 30, 2014 1:07 PM EDT
**To:** First administrative group/cn=Recipients/cn=rob
**CC:** First administrative group/cn=Recipients/cn=Jason
**Subject:** RE: We need to talk about my Maverick

Who went to direct ? I never got a single deal from one of your guys. You are not asking about splitting at this point and You never did. How can you ask me to split a shop that I was working with when two of your guys were hired? We all know the story of Ray. The Agent team is not up for discussion as I spend 1500 a month on their marketing an have to work with them for months. When you had this issue with Alex you gave him a guy you took. Thomas AND Ron's referral business can be a discuss as I am marketing with Maverick as well. let's discuss that then.

Dan Hart
410-963-7834
Dan@allstartitle.com

Ex. 19, October 30, 2014 Email 2.

59.  The next day, Desai agrees to allow All Star to charge borrowers on loans assigned and referred to All Star under the Kickback Agreement for fixed prices of $995.00 plus title and settlement services. These prices are higher than they would be without the illegal kickbacks, and include amounts charged to fund the kickbacks and not associated with any legitimate title or settlement services. Ex. 20, October 31, 2014 Email.

60.  In October 2014, Home Point assigns and refers 14 Home Point loans to All Star for title and settlement services in performance of the Kickback Agreement.

61.  In a November 12, 2014, email, All Star national marketing representative Dan Hart admits to the kickbacks All Star is paying Home Point – "the Sebeck group get $1500 a month in marketing." He emphasizes that borrowers on Home Point loans referred in performance of the Kickback Agreement must be charged no less that $895 plus title insurance costs to fund the kickbacks. Ex. 21, November 12, 2014 Email.

62.  During this same time period, Alex Mavroulis, a loan officer employed by Home Point in the Home Point branch managed by Sebeck, seeks kickbacks from All Star in exchange for Mavroulis' assignment and referral of Home Point loan, on real estate transactions originated by real estate agent and mortgage broker Jason Filippou, to All Star for title and settlement services. *See* Ex. 22, August 13, 2014 Email.

63.  Mavroulis and Filippou choose to use the kickbacks to produce and mail a postcard to prospective purchasers and borrowers.

64.  All Star launders the kickback through a third party marketing company in exchange for Mavroulis' agreement to assign and refer Home Point loans on real estate transactions originated by Filippou to All Star for title and settlement services.

65.  Following its pattern and practice of creating a "co-marketing" sham, All Star requires that the marketing piece nominally include All Star's logo, and other information, to create the false impression that its payment was for marketing services, when in fact All Star receives no marketing services from the payment. *See* Ex. 23, November 18, 2014 Email; Ex. 24, Filippou-Mavroulis Mailer; Ex. 25, Filippou-Mavroulis Revised Mailer.

66.  In addition, All Star's nominal inclusion is not reasonably related to the size of its payment. All Star makes a kickback payment equal to at least 1/3 the cost of the postcard but occupies

a far smaller portion on the postcard, appearing on less than 1/10 of the back of the postcard only.

67. At the same time as developing the postcard, All Star and Home Point discuss the minimum amount they can charge borrowers on Home Point loans assigned and referred under the Kickback Agreement in order to continue to fund the kickbacks, with All Star expressing that "premiums need to be plenty high for it to make sense." Ex. 26, November 13, 2014 Email 2.

68. All Star sets a minimum amount of $1,400.00 for title and settlement services fees on loans Home Point assigns and refers to All Star under the Kickback Agreement. Ex. 27, November 13, 2014 Email 4.

69. Just a few weeks later, on November 25, 2014, Desai pushes a Home Point borrower to use All Star for the title and settlement services despite the borrower's desire to use a different title and settlement services provider. Ex. 28, November 25, 2014 Email.

70. In November 2014, Home Point assigns and refers 23 Home Point loans to All Star for title and settlement services in performance of the Kickback Agreement.

71. The next month, on or about December, 16, 2014, All Star pays a $228.79 kickback to Home Point, laundered by and through Sharper Agent, a third-party marketing company. Ex. 29, December 16, 2014 Email; *see also* Ex. 30, December 6, 2014 Email.

72. In December 2014, Home Point assigns and refers 7 Home Point loans to All Star for title and settlement services in performance of the Kickback Agreement.

73. Overall, in 2015, Home Point assigns and refers 303 of Home Point loans to All Star in performance of the Kickback Agreement, secured by property in 24 states and Washington D.C.

74.     Based on All Star and Home Point's continuing pattern of practice, Plaintiffs believe, and therefore allege, All Star continues to pay kickbacks to Home Point for the assignment and referral of loans under the Kickback Agreement. *See, e.g.,* Ex. 31, November 9, 2015 Email; *see also,* Ex. 39, December 18, 2015 Email.

75.     Home Point assigns and refers 72 loans to All Star in 2016. Based on Home Point and All Star's continuing pattern of practice, Plaintiffs believe, and therefore aver, that the Home Point and All Star perform the Kickback Agreement at least through 2016, and perhaps longer.

76.     Based on Home Point and All Star's continuing pattern of practice, Plaintiffs believe, and therefore allege, that Home Point participates in the All Star Scheme by and through additional known and unknown Home Point branches, branch managers, and loan officers, in addition to those identified herein.

77.     Based on the continuing pattern of practice between All Star and Home Point, Plaintiffs believe, and therefore allege, that Home Point and All Star launder kickbacks by and through other third-party marketing companies in addition to those identified herein.

78.     Based on the continuing patter of practice between All Star and Homepoint, Plaintiffs believe and therefore aver that All Star pays, and Home Point receives and accepts, kickbacks in addition to those identified herein.

79.     In each instance and as part of the overall All Star Scheme, the payments made by All Star, which are laundered through third party marketing companies, are express payments for the referral of borrowers by Home Point to All Star and to conceal the illegal kickbacks, and not for the third party marketing company's provision of any goods or services to All Star.

17

80.    No good, facilities, or services are provided by any of Home Point's employees and/or agents, associated with the receipt and acceptance of the kickbacks. The payment by All Star, and the receipt and acceptance by Home Point, of the kickbacks are made expressly and solely for the assignment and referral by Home Point of Home Point borrowers to All Star.

81.    In furtherance of the "co-marketing" sham integral to the All Star Scheme, All Star is nominally included in the Home Point borrower solicitations, identified above, and at other times not included. But, consistent with All Star's early prototypes, advice to other Participating Lenders, and the overall All Star Scheme, All Star is included in only a nominal way, if at all. *See* Ex. 24, Filipou-Mavroulis Postcard.

82.    True to its design and intent, All Star does not receive any marketing benefit from any Home Point solicitation. Instead, borrowers contact Home Point branch managers, loan officers, and other employees, who assign and refer the Home Point borrower's loan to All Star under the Kickback Agreement and for the purpose of receiving the next kickback.

83.    In addition, and in the alternative, any payment from All Star to Home Point is not reasonably related to the value of any good, facility, or service that may have been provided by Home Point to All Star. As Jason Horwitz, All Star's owner and mastermind of the All Star Scheme, recognized with another Participating Lender:

On Mar 4, 2010, at 3:59 PM, "Jason" <jason@allstartitleinc.com> wrote:

> haha, uhh i was thinking the All Star part was a little more visible...lol i almost couldnt find it!
> Maybe next time we'll see how we can change it to maybe make our portion a little bigger or
> something...
>
> _____
>
> **From:** Angela Pobletts [mailto:Angela.Pobletts@enmcdirect.com]
> **Sent:** Thursday, March 04, 2010 3:46 PM
> **To:** Jason
> **Subject:** Fwd: Eagle Proof 35163 revision 3

Ex. 32, Mar. 4, 2010 email between A. Pobletts and J. Horwitz.

84.    Because Home Point did not provide any goods or facilities to All Star nor render any services to All Star, and because all of the kickbacks are paid solely in exchange for the assignment and referral of residential mortgage loans by Home Point, none of the kickback payments are entitled to safe harbor protection under 12 U.S.C. § 2607(c)(2).

85.    As a result of Home Point's performance of the Kickback Agreement, Home Point borrowers, including Plaintiffs and alleged Class Members, are harmed because they are: (a) defrauded into being charged and paying amounts not associated with any title and settlement service and solely to pay for the illegal kickbacks, (b) required to pay unnecessarily increased fees designed to pay for the illegal kickbacks, (c) denied kickback free title and settlement services, and (d) are denied their choice of title and settlement services provider.

### FACTUAL ALLEGATIONS RELATED TO
### THE INDIVIDUAL CLASS REPRESENTATIVES

86.    Plaintiffs' transactions, and the course of events thereafter, exemplify the Kickback Agreement. Moreover, the Kickback Agreement and are typical of all alleged Class Members' transactions.

I.    **Ms. Moyer's Loan**

87.   In November 2014, Ms. Sandra Moyer obtained a residential mortgage loan in relation to the refinance of her residential real property and principal residence located at 2307 Shannon Road, Edgewood, MD 21040, through Home Point loan officer, Ami Desai. Ms. Moyer's loan settled on November 21, 2014, with Home Point as the lender.

88.   Desai assigned and referred Ms. Moyer's loan to All Star in performance of the Kickback Agreement and as quid pro quo for the kickbacks Home Point received in August 2014 ¶¶ 51-53.

89.   Home Point's performance of the Kickback Agreement, deprived Ms. Moyer of her choice in selecting a title and settlement service provider and denied her kickback-free title and settlement services.

90.   Ms. Moyer is charged $1,214.92 in total title and settlement service fees for her Home Point loan. Ex. 33, Moyer HUD-1. These fees that Home Point and All Star agreed to charge Ms. Moyer included $500 for a title examination and $395 for an abstract, which is more than double the amount charged on average for similar services for similar transactions in Maryland. *See* Ex. 33, Moyer HUD-1.

91.   These charges include amounts not associated with a title examination, abstract, and/or legitimate title or settlement services and are charged for the purpose of funding the illegal kickbacks paid by All Star to Home Point. These charges are higher than they would be without the Kickback Agreement between Home Point and All Star and are unnecessarily increased by the illegal kickbacks received and accepted by Home Point from All Star under the Kickback Agreement.

92.   Ms. Moyer paid for these charges when All Star disbursed proceeds from her loan to pay for these title and settlement services charges.

93.   As a direct and proximate result of the Kickback Agreement, Ms. Moyer was harmed and suffered concrete injury because: (i) she was charged more for title and settlement services than she would be without the illegal Kickback Agreement; (ii) she was defrauded into being charged and paying unnecessarily increased amounts, unassociated with any legitimate title and settlement services, and to fund illegal kickbacks; (iii) she was stripped of her choice of title and settlement services provider and her mortgage broker's impartial evaluation of All Star's service and quality; and (iv) she was deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers..

## II.    Mr. Martin's Loan

94.   In October 2014, Mr. Richard Martin obtained a residential mortgage loan in relation to the refinance of his residential real property and principal residence located at 1104 Lucabaugh Mill Road, Westminster, MD 21157, through Home Point loan officer Ron Sebeck. Mr. Martin's loan settled on October 31, 2014, with Home Point as the lender.

95.   Sebeck referred Mr. Martin's loan to All Star in performance of the Kickback Agreement and as quid pro quo for the kickbacks Home Point received in August 2014 ¶¶ 51-53.

96.   Home Point's performance of the Kickback Agreement, deprived Mr. Martin of his choice in selecting a title and settlement services provider and denied him kickback-free title and settlement services.

97.   All Star charged Mr. Martin $1,850.00 in total title and settlement service fees for his Home Point loan. Ex 34, Martin HUD-1. These fees that Home Point and All Star agreed to charge Mr. Martin included $675.80 for a title examination and $675.80 for an abstract, which is

more than four times the amount charged on average for similar services for similar transactions in Maryland. *See* Ex. 34, Martin HUD-1.

98.     These charges include amounts not associated with a title examination, abstract, and/or legitimate title or settlement services and are charged for the purpose of funding the illegal kickbacks paid by All Star to Home Point. These charges are higher than they would be without the Kickback Agreement between Home Point and All Star and are unnecessarily increased by the illegal kickbacks received and accepted by Home Point from All Star under the Kickback Agreement.

99.     Mr. Martin paid for these charges when All Star disbursed proceeds from his loan to pay for these title and settlement services charges.

100.    As a direct and proximate result of the Kickback Agreement, Mr. Martin was harmed and suffered concrete injury because: (i) he was charged more for title and settlement services than he would be without the illegal Kickback Agreement; (ii) he was defrauded into being charged and paying unnecessarily increased amounts, unassociated with any legitimate title and settlement services, and to fund illegal kickbacks; (iii) he was stripped of his choice of title and settlement services provider and his mortgage broker's impartial evaluation of All Star's service and quality; and (iv) he was deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

III.    **Mr. Patterson's Loan**

101.    In September 2014, Mr. Terry Patterson, Jr., obtained a residential mortgage loan in relation to the refinance of his residential real property and principal residence located at

3458 Millers Station Road, Manchester, MD 21102, through Home Point loan officer Ron

Sebeck. Mr. Patterson's loan settled on September 23, 2014, with Home Point as the lender.

102.  Sebeck referred Mr. Patterson's loan to All Star in performance of the Kickback Agreement

and as quid pro quo for the kickbacks Home Point received in August 2014 ¶¶ 51-53.

103.  Home Point's performance of the Kickback Agreement, deprived Mr. Patterson of his

choice in selecting a title and settlement services provider and denied him kickback-free

title and settlement services.

104.  All Star charges Mr. Patterson $1,230.15 in total title and settlement service fees for his

Home Point loan. Ex 35, Patterson HUD-1. These fees that Home Point and All Star agreed

to charge Mr. Patterson included $399.00 for a title examination and $250.00 for an

abstract, which is more than double the amount charged on average for similar services for

similar transactions in Maryland. *See* Ex. 35, Patterson HUD-1.

105.  These charges include amounts not associated with a title examination, abstract, and/or

legitimate title or settlement services and are charged for the purpose of funding the illegal

kickbacks paid by All Star to Home Point. These charges are higher than they would be

without the Kickback Agreement between Home Point and All Star and are unnecessarily

increased by the illegal kickbacks received and accepted by Home Point from All Star

under the Kickback Agreement.

106.  Mr. Patterson paid for these charges when All Star disbursed proceeds from his loan to pay

for these title and settlement service charges.

107.  As a direct and proximate result of the Kickback Agreement, Mr. Patterson was harmed

and suffered concrete injury because: (i) he was charged more for title and settlement

services than he would be without the illegal Kickback Agreement; (ii) he was defrauded

into being charged and paying unnecessarily increased amounts, unassociated with any legitimate title and settlement service, and to fund illegal kickbacks; (iii) he was stripped of his choice of title and settlement services provider and his mortgage broker's impartial evaluation of All Star's service and quality; and (iv) he was deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

### IV.    Ms. Mathews's Loan

108.    In September 2014, Ms. Yvonne Mathews obtained a residential mortgage loan in relation to the refinance of her residential real property and principal residence located at 3102 Barclay Street, Baltimore, MD 21218, through Home Point loan officer, Joseph Truesdale. Ms. Mathews's loan settled on September 4, 2014, with Home Point as the lender.

109.    Truesdale referred Ms. Mathews's loan to All Star in performance of the Kickback Agreement and as quid pro quo for the kickbacks Home Point received in August 2014 ¶¶ 51-53.

110.    Home Point's performance of the Kickback Agreement, deprived Ms. Mathews of her choice in selecting a title and settlement services provider and denied her kickback-free title and settlement services.

111.    All Star charges Ms. Mathews was charged at least $1,441.27  in total title and settlement service fees for her Home Point loan, including $975 in settlement services other than title insurance. Ex 36,  All Star Closed Loans Spreadsheet, Sept. 2014.

112.    These charges include amounts not associated with a title examination, abstract, and/or other legitimate title or settlement services and are charged for the purpose of funding the illegal kickbacks paid by All Star to Home Point. These charges are higher than they would

24

be without the Kickback Agreement between Home Point and All Star and are unnecessarily increased by the illegal kickbacks received and accepted by Home Point from All Star under the Kickback Agreement.

113. Ms. Mathews paid for these charges when All Star disbursed proceeds from her loan to pay for these title and settlement service charges.

114. As a direct and proximate result of the Kickback Agreement, Ms. Mathews was harmed and suffered concrete injury because: (i) she was charged more for title and settlement services than she would be without the illegal Kickback Agreement; (ii) she was defrauded into being charged and paying unnecessarily increased amounts, unassociated with any legitimate title and settlement services, and to fund illegal kickbacks; (iii) she was stripped of his choice of title and settlement services provider and her mortgage broker's impartial evaluation of All Star's service and quality; and (iv) she was deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

## FACTUAL ALLEGATIONS RELATED TO LIMITATIONS

115. Essential to the Kickback Agreement, Home Point and All Star took affirmative steps to fraudulently conceal the illegal kickbacks, Kickback Agreement, and information related to the actual injuries and damages inflicted upon borrowers, including Plaintiffs and alleged Class Members.

**I.** **Home Point and All Star conceal the kickbacks by laundering them through third-party marketing companies and sham entities.**

116.    Home Point and All Star conceal the kickbacks by laundering the kickbacks through third-
        party marketing companies, including Influence Direct, MISTID Marketing, LLC, Viatele,
        and L.B.E. Data.

117.    Laundering the kickbacks through third-party marketing companies conceal the fact that
        Home Point accepted anything of value from All Star in exchange for loan referrals, which
        included Plaintiffs' and Class Members' loans.

118.    Most of, if not all, the kickbacks that are laundered through a third-party marketing
        company, cause sham invoices to be generated. These invoices are shams, and fraudulent,
        because they falsely represent that All Star received marketing services for the kickbacks.
        However, All Star's kickback to the third-party marketing company was for the sole benefit
        of Home Point.

119.    This false record conceals the kickbacks and Kickback Agreement from any person who
        examines All Star's financial records including auditors, regulators, law enforcement, and
        borrowers.

**II.    Home Point and All Star falsely allocate fees and manipulate their APR.**

120.    The Truth in Lending Act ("TILA") mandates that lenders report to borrowers the Annual
        Percentage Rate, or "APR," associated with a loan, refinance, or reverse mortgage. While
        the interest rate of a loan is the cost to borrow the principal loan amount, the APR includes
        the interest rate plus certain other lender fees, such as origination fees, discount points, and
        some closing costs, including some title and settlement services fees. The APR is intended
        to serve as a tool for borrowers to compare, among other things, closing and settlement
        costs across loans with similar interest rates, and to easily identify when one loan has
        substantially higher fees than another at the same interest rate. Lenders are required to

report to borrowers a calculation of the APR on various loan documents, including the TILA disclosure.

121. The title and settlement services fees excluded from the APR calculation are defined by TILA. 12 C.F.R. § 1026.4(c). Since some fees are excluded from the APR, title and settlement services companies and lenders can manipulate – and falsely minimize – the APR by falsely allocating amounts charged for title and settlement services to those categories of fees excluded from the APR calculation.

122. As a regular and continuing business practice, Home Point and All Star allocate the charges for title and settlement services associated with their loans only to those categories of title services not included in the APR. This falsely minimized and falsely represented the APR reported on Home Point borrowers' loan documents and federal disclosures.

123. For example, "fees for title examination, abstract of title, [and] title insurance" are excluded from the APR calculation. *See* 12 C.F.R. § 1026.4(c)(7)(i). Meanwhile, settlement or closing fees and application signing fees are settlement service costs required to be included in the APR calculation. *See* 12 C.F.R. § 1026.4(a)(1)(i). By allocating charges associated with conducting a settlement or closing to the category of "title exam" or "abstract," Home Point and All Star falsely minimized and falsely represented the APR.

124. All Star claims the false allocation of fees and manipulation of the APR as a regular business practice, allocating all charges for title and settlement service to "Title Exam" or "Abstract" because those fees are excluded from, and do not raise, the APR. *See, e.g.*, Ex. 37, June 6, 2011 E-mail; Ex. 38, September 24, 2015 E-mail.

125. Home Point participates in and ratifies this false allocation of fees. *See* Ex. 40, October 2, 2015 Email; Ex. 41 October 5, 2015 Email; Ex. 42 December 15, 2015 Email.

27

126. Based on this continuing pattern of practice, Plaintiffs believe, and therefore allege, that Home Point and All Star engaged in the false allocation and manipulation of the APR throughout the time period Home Point participated in the All Star Scheme. *See, e.g.,* Ex. 33, Moyer HUD-1; Ex. 34, Martin HUD-1; Ex. 35, Patterson HUD-1.

127. For example, despite conducting a settlement or closing with each Home Point borrower, Home Point chooses to not allocate any amount of All Star's charges associated with a borrower's loan to "settlement or closing fee" because that charge is included in the APR. Instead, All Star and Home Point allocate all charges, including that portion attributable to conducting a settlement or closing, to "Title Exam" or "Abstract", which are excluded from the APR. *See, e.g.,* Ex. 33, Moyer HUD-1; Ex. 34, Martin HUD-1; Ex. 35, Patterson HUD-1.

128. Home Point and All Star's choice to falsely allocate fees results in the fraudulent reporting of the false APR's and the false, and falsely minimized, representation of the cost of the loan to Home Point's borrowers.

129. Home Point and All Star's choice to falsely allocate fees and fraudulently report these false allocations in borrowers' loan documents concealed from Home Point borrowers the artificially inflated prices of title and settlement services resulting from the Kickback Agreements and prevented borrowers from discovering the unnecessarily increased prices of their title and settlement services fees.

130. As a regular business practice, All Star uses various software programs, including "Titlehound," to produce borrower loan documents, including documents reporting the APRs associated with a loan. All Star causes this software, including Titlehound, to be programmed to make these false allocations of title and settlement service fees and the

resulting false APR calculations, and to produce Home Point's loan documents to present to borrowers and on which Home Point, and All Star, intend borrowers rely.

131.    Home Point and All Star's choice to falsely allocate fees and manipulate and falsely report APRs fraudulently conceal from Home Point borrowers the coordinated business relationships between All Star and Home Point under the Kickback Agreement, the unnecessarily increased prices for title and settlement services resulting from the Kickback Agreement, and affirmatively prevent Home Point borrowers from discovering their injuries resulting therefrom.

**III.    Home Point and All Star makes false representations on borrowers' loan documents.**

132.    Home Point and All Star made false representations on Plaintiffs' and other borrowers' loan documents despite federal regulations requiring accurate disclosure.

133.    At all relevant times, federal law requires Home Point, as a lender, to provide a "Good Faith" Estimate to the borrower within three days of taking a loan application. 12 C.F.R. § 1024.7(a)-(b). "The required standardized GFE form must be prepared completely and accurately." 12 C.F.R. App'x C to Part 1024 – Instructions for Completing the Good Faith Estimate (GFE) Form.

134.    Block 4 of the "Good Faith" Estimate requires disclosure of only the charges for "title services and lender's title insurance." *Id*.

135.    As a regular pattern of practice, Home Point falsely includes in Block 4 charges that are not title services and lender's title insurance, including the illegal kickbacks, which include amounts that are not associated with any legitimate title or settlement services and are charged for the sole purpose of funding the illegal kickbacks.

136.   Home Point's decision to falsely include these charges in Block 4 of the "Good Faith" Estimate conceals from borrowers: (i) the existence of the illegal kickback; (ii) the amount of the illegal kickback; and (iii) the coordinated business relationship between Home Point and All Star under the Kickback Agreement.

137.   In addition, the loan originator must state in Block 1 of the "Good Faith" Estimate:

> [A]ll charges that loan originators involved in this transaction will receive, except for any charge for the specific interest rate chosen (points). A loan originator may not separately charge any additional fees for getting this loan, including for application, processing, or underwriting. The amount stated in Block 1 is subject to zero tolerance, *i.e.,* the amount may not increase at settlement.

12 C.F.R. App'x C to Part 1024 – Instructions for Completing the Good Faith Estimate (GFE) Form.

138.   As a regular pattern of practice, Home Point omits the illegal kickbacks in Block 1 of the "Good Faith" Estimates notwithstanding that Home Point receives the kickbacks in the transactions.

139.   Home Point's decision to omit the illegal kickbacks from Block 1 of the "Good Faith" Estimate conceals from borrowers: (i) the existence of the illegal kickbacks; (ii) the amount of the illegal kickbacks, and (iii) the coordinated business relationship between Home Point and All Star  under the Kickback Agreement.

140.   In addition to the "Good Faith" Estimate, federal law, at all relevant times, requires each borrower to receive a HUD-1 Settlement Statement at the closing or settlement of a loan. The settlement agent produces the HUD-1, but federal regulations require that the loan originator provide the settlement agent with all information appearing in the HUD-1 Settlement Statement.

141.   Section 1100 of the HUD-1 discloses the title and settlement services on the loan to the borrower, along with the associated charges for those services.

142.   As a continuing pattern and regular business practice, Home Point and All Star repeatedly allocate inappropriate fees on Home Point borrowers' HUD-1 statements in Section 1100 as described in ¶¶ 131-136.

143.   As a continuing pattern of practice, Home Point omits from the HUD-1 the existence and amount of the kickbacks received by Home Point related to the borrower's loan, when Home Point is required to report the kickback on, at least, Line 808 of the HUD-1.

144.   Further, Home Point is required to itemize amounts in Section 1100 or Section 1300 of the HUD-1, but instead omits any description of the illegal kickbacks from these sections and fraudulently lumps the amount of the kickbacks into the categories associated with legitimate title and settlement services, such as the title examination and/or abstract. Again, this act is fraudulent because the kickbacks are unassociated with any legitimate title and settlement services and are charged solely for the purpose of paying for illegal kickbacks.

145.   Lenders authorized to underwrite government insured or guaranteed loans, such as VA or FHA loans, often use charts produced by the Department of Housing and Urban Development ("HUD") listing the Mean, Median, and 80th percentile of settlement services charges, which are assorted by state to measure a "reasonable and customary" settlement service fee per 24 C.F.R. § 203.27.

146.   These authorized lenders generally require their mortgage broker correspondents, like Home Point, to follow these charts.

147. Pursuant to 24 C.F.R. § 203.27 and 24 C.F.R. § 203.233, Home Point is required to certify that the charges on its loans comply with these guidelines. This certification is presented to borrowers on the "Direct Endorsement" form.

148. As a regular business practice, Home Point falsely certifies borrowers Direct Endorsement forms. These certifications are false because the fees do not comply with HUD regulations, as the charges resulting from the Kickback Agreement are unnecessarily increased by the illegal kickbacks, not "reasonable and customary", and include amounts unassociated with any legitimate title and settlement services.

149. These false representations and omissions, presented to Home Point borrowers, at closing, by All Star as Home Point's agent, fraudulently conceal: (i) the existence of the illegal kickbacks; (ii) the amount of the illegal kickbacks and the fact that borrowers are being charged an amount unassociated with a legitimate title and settlement service; and (iii) the coordinated business relationship between Home Point and All Star under the Kickback Agreement.

## IV. Plaintiffs' Reasonable Diligence

150. As a result of the fraudulent concealments by Home Point and All Star, Plaintiffs and all members of the alleged Class had no actual notice of the illegal kickbacks, the exchange of any thing of value between Home Point and All Star related to their Home Point loan, or the coordinated business relationship of Home Point and All Star under the Kickback Agreement before, during, or after their closing.

151. Plaintiffs exercised reasonable diligence before, during, and after the closing of their loans.

### A. Ms. Moyer is reasonably diligent.

32

152. Ms. Moyer receives and reviews her loan documents prepared by Home Point prior to closing.

153. Ms. Moyer believes, and therefore avers, that her pre-closing loan documents include a "Good Faith" Estimate prepared by Home Point.

154. Home Point chooses to omit from Ms. Moyer's "Good Faith" Estimate any description or statement of the coordinated business relationship between Home Point and All Star and to include the fraudulent representations and omissions described in ¶¶ 137-145. Ms. Moyer believes, and therefore avers, that her "Good Faith" Estimate does not identify All Star as the provider of any title or settlement services related to her refinance.

155. Home Point chooses to include in her pre-closing documents the false allocation of fees and a false APR as described in ¶¶ 131-136. Ms. Moyer's belief is supported by the allocation of fees in her HUD-1, which is consistent with Home Point and All Star's past pattern of false allocation of fees and false statement of the APR.

156. Home Point makes the false statements and omissions in Ms. Moyer's pre-closing loan documents for the purposes of concealing, and did so conceal from Ms. Moyer, the coordinated business relationship between Home Point and All Star, the Kickback Agreement, the fact, nature, and amount of the illegal kickbacks related to Ms. Moyer's loan, and the nature of the inflated charges Ms. Moyer paid for title and settlement services.

157. As is reasonable under the circumstances, Ms. Moyer reasonably believed these pre-closing documents and the representations made therein. A reasonable borrower would have no reason to believe, as Ms. Moyer did not believe, that: (i) a coordinated business relationship exists between Home Point and All Star; (ii) there has been any payment or exchange of a thing of value between Home Point and All Star related to the assignment and referral of

Ms. Moyer's loan for title and settlement services; (iii) the charges for the title and settlement services include any amounts not associated with the settlement services; or (iv) that the prices for title and settlement services are the result of and unnecessarily increased by the Kickback Agreement between Home Point and All Star.

158.    Ms. Moyer acts diligently during the closing or settlement of her loan. As a condition of funding her loan, Home Point requires Ms. Moyer to participate in a closing, and she attends and fully participates in the required closing.

159.    At the closing of her loan, Ms. Moyer receives from All Star, or its agent, all the loan documents required by Home Point to close her loan, including the HUD-1.

160.    Home Point and All Star choose to omit from the documents Ms. Moyer receives at closing, including her HUD-1, any description or statement of the coordinated business relationship between Home Point and All Star under the Kickback Agreement. *See* Ex. 33, Moyer HUD-1.

161.    Home Point and All Star choose to omit from the documents Ms. Moyer receives at closing, including her HUD-1, any description or statement of any payment, amount, or thing of value that was paid by All Star to Home Point, or received by Home Point from All Star, related to Ms. Moyer's loan. *See* Ex. 33, Moyer HUD-1.

162.    Home Point and All Star choose to include in Ms. Moyer's documents, including her HUD-1, the falsely allocated fees as described in ¶¶ 131-136, which resulted in the fraudulent representations and omissions described in ¶¶ 137-145. *See* Ex. 33, Moyer HUD-1.

163.    Home Point chooses to include, in the documents Ms. Moyer receives at closing, the false certification described in ¶¶ 146-148.

164.    Home Point and All Star make the fraudulent omissions and representations and false certifications in Ms. Moyer's loan closing documents for the purposes of concealing, and did so conceal from Ms. Moyer, the coordinated business relationship between Home Point and All Star, the Kickback Agreement, the fact, nature, and amount of the illegal kickback related to Ms. Moyer's loan, and Ms. Moyer's injuries and actual damages therefrom.

165.    As is reasonable under the circumstances, Ms. Moyer reasonably believes these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Ms. Moyer did not believe, that: (i) a coordinated business relationship exists between Home Point and All Star; (ii) there has been any payment or exchange of a thing of value between Home Point and All Star related to the assignment and referral of Ms. Moyer's loan for title and settlement services; (iii) the charges for the title and settlement services include any amounts not associated with the settlement services; or (iv) that the prices for title and settlement services are the result of and unnecessarily increased by the Kickback Agreement between Home Point and All Star.

166.    Ms. Moyer acts diligently after her closing. On or about October 31, 2019, Ms. Moyer receives a letter from undersigned counsel describing an investigation of Home Point and All Star. This is Ms. Moyer's first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

167.    Within days, Ms. Moyer contacts and retains counsel. Ms. Moyer files this Complaint within a year of becoming aware of the facts giving rise to her causes of action.

    **B.      Mr. Martin is reasonably diligent.**

168.    Mr. Martin receives and reviews his loan documents prepared by Home Point prior to closing.

169. Mr. Martin believes, and therefore avers, that his pre-closing loan documents include a "Good Faith" Estimate prepared by Home Point.

170. Home Point chooses to omit from Mr. Martin's "Good Faith" Estimate any description or statement of the coordinated business relationship between Home Point and All Star and to include the fraudulent representations and omissions described in ¶¶ 137-145. Mr. Martin believes, and therefore avers, that his "Good Faith" Estimate does not identify All Star as the provider of any title or settlement services related to his refinance.

171. Home Point chooses to include in his pre-closing documents the false allocation of fees and a false APR as described in ¶¶ 131-136. Mr. Martin's belief is supported by the allocation of fees in his HUD-1, which is consistent with Home Point and All Star's past pattern of false allocation of fees and false statement of the APR.

172. Home Point makes the false statements and omissions in Mr. Martin's pre-closing loan documents for the purposes of concealing, and did so conceal from Mr. Martin, the coordinated business relationship between Home Point and All Star, the Kickback Agreement, the fact, nature, and amount of the illegal kickbacks related to Mr. Martin's loan, and the nature of the inflated charges Mr. Martin paid for title and settlement services.

173. As is reasonable under the circumstances, Mr. Martin reasonably believed these pre-closing documents and the representations made therein. A reasonable borrower would have no reason to believe, as Mr. Martin did not believe, that: (i) a coordinated business relationship exists between Home Point and All Star; (ii) there has been any payment or exchange of a thing of value between Home Point and All Star related to the assignment and referral of Mr. Martin's loan for title and settlement services; (iii) the charges for the title and settlement services include any amounts not associated with the settlement services; or (iv)

that the prices for title and settlement services are the result of and unnecessarily increased by the Kickback Agreement between Home Point and All Star.

174. Mr. Martin acts diligently during the closing or settlement of his loan. As a condition of funding his loan, Home Point requires Mr. Martin to participate in a closing, and he attends and fully participates in the required closing.

175. At the closing of his loan, Mr. Martin receives from All Star, or its agent, all the loan documents required by Home Point to close his loan, including the HUD-1.

176. Home Point and All Star choose to omit from the documents Mr. Martin receives at closing, including his HUD-1, any description or statement of the coordinated business relationship between Home Point and All Star under the Kickback Agreement. *See* Ex. 34, Martin HUD-1.

177. Home Point and All Star choose to omit from the documents Mr. Martin receives at closing, including his HUD-1, any description or statement of any payment, amount, or thing of value that was paid by All Star to Home Point, or received by Home Point from All Star, related to Mr. Martin's loan. *See* Ex. 34, Martin HUD-1.

178. Home Point and All Star choose to include in Mr. Martin's documents, including his HUD-1, the falsely allocated fees as described in ¶¶ 131-136, which resulted in the fraudulent representations and omissions described in ¶¶ 137-145. *See* Ex. 34, Martin HUD-1.

179. Home Point chooses to include, in the documents Mr. Martin receives at closing, the false certification described in ¶¶ 146-148.

180. Home Point and All Star make the fraudulent omissions and representations and false certifications in Mr. Martin's loan closing documents for the purposes of concealing, and did so conceal from Mr. Martin, the coordinated business relationship between Home Point

and All Star, the Kickback Agreement, the fact, nature, and amount of the illegal kickback related to Mr. Martin's loan, and Mr. Martin's injuries and actual damages therefrom.

181.    As is reasonable under the circumstances, Mr. Martin reasonably believes these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Mr. Martin did not believe, that: (i) a coordinated business relationship exists between Home Point and All Star; (ii) there has been any payment or exchange of a thing of value between Home Point and All Star related to the assignment and referral of Mr. Martin's loan for title and settlement services; (iii) the charges for the title and settlement services include any amounts not associated with the settlement services; or (iv) that the prices for title and settlement services are the result of and unnecessarily increased by the Kickback Agreement between Home Point and All Star.

182.    Mr. Martin acts diligently after his closing. On or about October 31, 2019, Mr. Martin receives a letter from undersigned counsel describing an investigation of Home Point and All Star. This is Mr. Martin's first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

183.    Within days, Mr. Martin contacts and retains counsel. Mr. Martin files this Complaint within a year of becoming aware of the facts giving rise to his causes of action.

**C.    Mr. Patterson is reasonably diligent.**

184.    Mr. Patterson receives and reviews his loan documents prepared by Home Point prior to closing.

185.    Mr. Patterson believes, and therefore avers, that his pre-closing loan documents include a "Good Faith" Estimate prepared by Home Point.

186.    Home Point chooses to omit from Mr. Patterson's "Good Faith" Estimate any description or statement of the coordinated business relationship between Home Point and All Star and to include the fraudulent representations and omissions described in ¶¶ 137-145. Mr. Patterson believes, and therefore avers, that his "Good Faith" Estimate does not identify All Star as the provider of any title or settlement services related to his refinance.

187.    Home Point chooses to include in his pre-closing documents the false allocation of fees and a false APR as described in ¶¶ 131-136. Mr. Patterson's belief is supported by the allocation of fees in his HUD-1, which is consistent with Home Point and All Star's past pattern of false allocation of fees and false statement of the APR.

188.    Home Point makes the false statements and omissions in Mr. Patterson's pre-closing loan documents for the purposes of concealing, and did so conceal from Mr. Patterson, the coordinated business relationship between Home Point and All Star, the Kickback Agreement, the fact, nature, and amount of the illegal kickbacks related to Mr. Patterson's loan, and the nature of the inflated charges Mr. Martin paid for title and settlement services.

189.    As is reasonable under the circumstances, Mr. Patterson reasonably believed these pre-closing documents and the representations made therein. A reasonable borrower would have no reason to believe, as Mr. Patterson did not believe, that: (i) a coordinated business relationship exists between Home Point and All Star; (ii) there has been any payment or exchange of a thing of value between Home Point and All Star related to the assignment and referral of Mr. Patterson's loan for title and settlement services; (iii) the charges for the title and settlement services include any amounts not associated with the settlement services; or (iv) that the prices for title and settlement services are the result of and unnecessarily increased by the Kickback Agreement between Home Point and All Star.

190. Mr. Patterson acts diligently during the closing or settlement of his loan. As a condition of funding his loan, Home Point requires Mr. Patterson to participate in a closing, and he attends and fully participates in the required closing.

191. At the closing of his loan, Mr. Patterson receives from All Star, or its agent, all the loan documents required by Home Point to close his loan, including the HUD-1.

192. Home Point and All Star choose to omit from the documents Mr. Patterson receives at closing, including his HUD-1, any description or statement of the coordinated business relationship between Home Point and All Star under the Kickback Agreement. *See* Ex. 35, Patterson HUD-1.

193. Home Point and All Star choose to omit from the documents Mr. Patterson receives at closing, including his HUD-1, any description or statement of any payment, amount, or thing of value that was paid by All Star to Home Point, or received by Home Point from All Star, related to Mr. Patterson's loan. *See* Ex. 35, Patterson HUD-1.

194. Home Point and All Star choose to include in Mr. Patterson's documents, including his HUD-1, the falsely allocated fees as described in ¶¶ 131-136, which resulted in the fraudulent representations and omissions described in ¶¶ 137-145. *See* Ex. 34, Patterson HUD-1.

195. Home Point chooses to include, in the documents Mr. Patterson receives at closing, the false certification described in ¶¶ 146-148.

196. Home Point and All Star make the fraudulent omissions and representations and false certifications in Mr. Patterson's loan closing documents for the purposes of concealing, and did so conceal from Mr. Patterson, the coordinated business relationship between Home Point and All Star, the Kickback Agreement, the fact, nature, and amount of the

illegal kickback related to Mr. Patterson's loan, and Mr. Patterson's injuries and actual damages therefrom.

197.    As is reasonable under the circumstances, Mr. Patterson reasonably believes these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Mr. Patterson did not believe, that: (i) a coordinated business relationship exists between Home Point and All Star; (ii) there has been any payment or exchange of a thing of value between Home Point and All Star related to the assignment and referral of Mr. Patterson's loan for title and settlement services; (iii) the charges for the title and settlement services include any amounts not associated with the settlement services; or (iv) that the prices for title and settlement services are the result of and unnecessarily increased by the Kickback Agreement between Home Point and All Star.

198.    Mr. Patterson acts diligently after his closing. On or about October 31, 2019, Mr. Patterson receives a letter from undersigned counsel describing an investigation of Home Point and All Star. This is Mr. Patterson's first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

199.    Within days, Mr. Patterson contacts and retains counsel. Mr. Patterson files this Complaint within a year of becoming aware of the facts giving rise to his causes of action.

   **D.    Ms. Mathews is reasonably diligent.**

200.    Ms. Mathews receives and reviews her loan documents prepared by Home Point prior to closing.

201.    Ms. Mathews believes, and therefore avers, that her pre-closing loan documents include a "Good Faith" Estimate prepared by Home Point.

202. Home Point chooses to omit from Ms. Mathews's "Good Faith" Estimate any description or statement of the coordinated business relationship between Home Point and All Star and to include the fraudulent representations and omissions described in ¶¶ 137-145. Ms. Mathews believes, and therefore avers, that her "Good Faith" Estimate does not identify All Star as the provider of any title or settlement services related to her refinance.

203. Home Point chooses to include in her pre-closing documents the false allocation of fees and a false APR as described in ¶¶ 131-136.

204. Home Point makes the false statements and omissions in Ms. Mathews's pre-closing loan documents for the purposes of concealing, and did so conceal from Ms. Mathews, the coordinated business relationship between Home Point and All Star, the Kickback Agreement, the fact, nature, and amount of the illegal kickbacks related to Ms. Mathews's loan, and the nature of the inflated charges Ms. Mathews paid for title and settlement services.

205. As is reasonable under the circumstances, Ms. Mathews reasonably believed these pre-closing documents and the representations made therein. A reasonable borrower would have no reason to believe, as Ms. Mathews did not believe, that: (i) a coordinated business relationship exists between Home Point and All Star; (ii) there has been any payment or exchange of a thing of value between Home Point and All Star related to the assignment and referral of Ms. Mathews's loan for title and settlement services; (iii) the charges for the title and settlement services include any amounts not associated with the settlement services; or (iv) that the prices for title and settlement services are the result of and unnecessarily increased by the Kickback Agreement between Home Point and All Star.

206.    Ms. Mathews acts diligently during the closing or settlement of her loan. As a condition of funding her loan, Home Point requires Ms. Mathews to participate in a closing, and she attends and fully participates in the required closing.

207.    At the closing of her loan, Ms. Mathews receives from All Star, or its agent, all the loan documents required by Home Point to close her loan, including the HUD-1.

208.    Home Point and All Star choose to omit from the documents Ms. Moyer receives at closing, including her HUD-1, any description or statement of the coordinated business relationship between Home Point and All Star under the Kickback Agreement.

209.    Home Point and All Star choose to omit from the documents Ms. Mathews receives at closing, including her HUD-1, any description or statement of any payment, amount, or thing of value that was paid by All Star to Home Point, or received by Home Point from All Star, related to Ms. Mathews's loan.

210.    Home Point and All Star choose to include in Ms. Mathews's documents, including her HUD-1, the falsely allocated fees as described in ¶¶ 131-136, which resulted in the fraudulent representations and omissions described in ¶¶ 137-145.

211.    Home Point chooses to include, in the documents Ms. Mathews receives at closing, the false certification described in ¶¶ 146-148.

212.    Home Point and All Star make the fraudulent omissions and representations and false certifications in Ms. Mathews's loan closing documents for the purposes of concealing, and did so conceal from Ms. Mathews, the coordinated business relationship between Home Point and All Star, the Kickback Agreement, the fact, nature, and amount of the illegal kickback related to Ms. Mathews's loan, and Ms. Mathews's injuries and actual damages therefrom.

213.    As is reasonable under the circumstances, Ms. Mathews reasonably believes these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Ms. Mathews did not believe, that: (i) a coordinated business relationship exists between Home Point and All Star; (ii) there has been any payment or exchange of a thing of value between Home Point and All Star related to the assignment and referral of Ms. Mathews's loan for title and settlement services; (iii) the charges for the title and settlement services include any amounts not associated with the settlement services; or (iv) that the prices for title and settlement services are the result of and unnecessarily increased by the Kickback Agreement between Home Point and All Star.

214.    Ms. Mathews acts diligently after her closing. On or about October 31, 2019, Ms. Mathews receives a letter from undersigned counsel describing an investigation of Home Point and All Star. This is Ms. Mathews's first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

215.    Within days, Ms. Mathews contacts and retains counsel. Ms. Mathews files this Complaint within a year of becoming aware of the facts giving rise to her causes of action.

216.    As a result of Home Point's and All Star's fraudulent concealment and Plaintiffs' reasonable diligence before, during, and after closing, the statute of limitations to all causes of action pled herein were tolled beginning on the date of each Plaintiffs' loan closing and continued until Plaintiffs learned of the facts giving rise to their causes of action, which, until such time as Plaintiffs and Class Members knew or should have known of their injury, which, for each Named Plaintiff, including Ms. Moyer, Mr. Martin, Mr. Patterson, and Ms. Mathews, was on or about October 31, 2019.

217.    Plaintiffs believe, and therefore aver, that the fraudulent concealment described herein was an integral component of the Kickback Agreement and is typical of all alleged Class Members' transactions, such that all Class Members are entitled to fraudulent concealment tolling of the applicable limitations period.

### COUNT I
### Violation of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2607(a)

218.    Plaintiffs incorporate the above stated paragraphs as if restated herein.

219.    All transactions at issue in the instant complaint are incident to, or part of, real estate settlement services involving federally related mortgage loans secured by first or subordinate liens on residential real property and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

220.    At all relevant times, All Star was subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

221.    As a lender, broker, and/or servicer of federally related mortgage loans and loans secured by first or subordinate liens on residential real property, Home Point is subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

222.    Home Point, through its brokers, loan officers, employees, and/or agents, accepted things of value paid by All Star in exchange for the referral of business to All Star, specifically federally related mortgage loans, in violation of RESPA, 12 U.S.C. § 2607(a).

223.    The payment and/or arranging of payment of kickbacks to Home Point by All Star and Home Point's receipt thereof constitute a violation of § 8(a) of RESPA, which prohibits the payment of referral fees or kickbacks pursuant to an agreement in connection with the origination or brokering of federally related mortgage loans.

224. The kickbacks from All Star to Home Point are not associated with any goods, facilities, or services actually provided by Home Point, or any of its agents and/or employees, to All Star. In addition or in the alternative, the value of any good, facility, or service claimed to be provided by Home Point to All Star is not reasonably related to the kickback from All Star such that the payment is not "bona fide" or within the protection of 12 U.S.C. § 2607(c)(2).

225. In addition, All Star's laundering of money through the third-party marketing companies is always kickbacks to Home Point for the assignment and referral of Home Point loans to All Star, rather than for goods given to or services performed for All Star.

226. In the alternative, any payment made by All Star to Home Point and/or laundered through any third-party marketing company is far greater, and not reasonably related, to All Star's nominal presence in the solicitations and are, in reality, kickbacks designed to look like legitimate payments.

227. Plaintiffs allege claims for violations of 12 U.S.C. § 2607(a) on their own behalf and pursuant to Md. Rule 2-231 with the class defined as follows:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by Home Point Financial Corporation, formerly known as Maverick Corporation, for which All Star Title, Inc., provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2014, and December 31, 2016. Exempted from this class is any person who, during the period of January 1, 2014, through December 31, 2016, was an employee, officer, member and/or agent of Home Point Financial Corporation, Maverick Corporation, or All Star Title, Inc.

(the "Home Point Class").

228.   There are questions of law and fact common to the claims of each and all members of the Home Point Class.  These common questions include, but are not limited to:

a.   Whether there existed a referral agreement between Home Point and All Star whereby Home Point agreed to assign and refer Home Point loans, refinances, and reverse mortgages to All Star in exchange for kickbacks;

b.   Whether Home Point and its employees and/or agents received illegal kickbacks from All Star for the assignment and referral of business to All Star;

c.   Whether the illegal kickbacks to Home Point and its employees and/or agents violated RESPA;

d.   Whether Home Point and All Star used third-party marketing companies to launder kickbacks related to Home Point loans;

e.   Whether Plaintiffs and Home Point Class Members were forced to pay higher and unnecessarily increased charges for settlement services;

f.   Whether Home Point used sham invoices and payment records to actively and fraudulently conceal the payment, receipt, and acceptance of illegal kickbacks;

g.   Whether Home Point disclosed or described to any borrower its coordinated business relationship with All Star or the fact that a thing of value had been exchanged between Home Point and All Star related to any borrower's loan;

h.   Whether Home Point disclosed or described on any borrowers' "Good Faith" Estimate, HUD-1, or other loan document that Home Point had a coordinated business relationship with All Star or the fact that a thing of value had been exchanged between Home Point and All Star related to any borrower's loan;

    i.    Whether, despite exercising reasonable due diligence, Plaintiffs and Home Point Class Members did not and could not have learned of the illegal kickbacks until contacted by counsel;

    j.    Whether Plaintiffs and Home Point Class Members are entitled to treble damages under RESPA; and

    k.    Whether Plaintiffs and Home Point Class Members are entitled to attorneys' fees and expenses under RESPA.

229.    These common issues of law and fact predominate over any question affecting only individual Home Point Class Members.

230.    Plaintiffs' transactions and claims are typical of the claims or defenses of the respective Home Point Class Members and are subject to the same statutory measure of damages set forth in 12 U.S.C. § 2607(d)(2).

231.    Plaintiffs will fairly and adequately protect the interests of the Home Point Class because the Plaintiffs' interests are identical to the interests of all other members of the Home Point Class.

232.    Plaintiffs' counsel have substantial experience in complex litigation and class action proceedings, have been approved as class and settlement class counsel in similar litigation, and will adequately represent the Home Point Class' interests.

233.    The Home Point Class consists of borrowers on at least 83 loans, and on information and belief, as many as 444 loans, and thus are so numerous that joinder of all members is impracticable.

234.     Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Defendant.

235.     This action entails questions of law and fact common to Home Point Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

236.     Most members of the Home Point Class are unaware of their rights to prosecute a claim against Home Point.

237.     No member of the Home Point Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Md. Rule 2-231.

**WHEREFORE**, Plaintiffs respectfully demand:

a.  This Court certify the Home Point Class pursuant to Maryland Rule 2-231and set this matter for trial;

b.  Judgment for Plaintiffs and Home Point Class Members against Home Point and award Plaintiffs and Home Point Class Members damages in the amount equal to three times the amount of any charge paid for such settlement services, pursuant to 12 U.S.C. § 2607(d)(2);

c.  Reasonable attorneys' fees, interest, and costs pursuant to 12 U.S.C. § 2607(d)(5); and

d.  For such other and further relief as this Court deems appropriate.

[SIGNATURES ON THE FOLLOWING PAGE]

Dated:  October 23, 2020

Respectfully submitted,

_____/s/_____

Michael Paul Smith, Esq.
(CPF# 9212170165)
Melissa L. English, Esq.
(CPF# 1512140006)
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, Maryland 21204
(410) 821-0070 / (410) 821-0071 (fax)
Email: mpsmith@sgs-law.com
menglish@sgs-law.com
*Counsel for Plaintiffs and Class Members*

## PRAYER FOR JURY TRIAL

Plaintiffs and Class Members hereby request a trial by jury on the foregoing Class Action

Complaint.

_____/s/_____

Michael Paul Smith, Esq.
(CPF# 9212170165)
Melissa L. English, Esq.
(CPF# 1512140006)
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, Maryland 21204
(410) 821-0070 / (410) 821-0071 (fax)
Email: mpsmith@sgs-law.com
menglish@sgs-law.com
*Counsel for Plaintiffs and Class Members*