**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| **SANDRA MOYER, RICHARD MARTIN.**<br>**TERRY PATTERSON, JR.,** and **YVONNE**<br>**MATTHEWS,** *et al.*,<br><br>        *Plaintiffs*<br><br>v.<br><br>**HOME POINT FINANCIAL**<br>**CORPORATION** f/k/a **MAVERICK**<br>**FUNDING CORPORATION,**<br><br>        *Defendant*. | **Civil Action No.: RDB-20-3449** |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Plaintiffs Sandra Moyer, Richard Martin, Terry Patterson, Jr., and Yvonne Matthews

("Plaintiffs") on behalf of themselves and the entire class of persons similarly situated, by and

through their undersigned counsel, file this Memorandum of Law in support of Plaintiffs' Motion

for Class Certification. For the reasons stated herein, Plaintiffs respectfully request the motion be

granted, and the proposed Home Point Class be certified pursuant to Fed. R. Civ. P. 23.

Dated: January 21, 2022

Respectfully submitted,

Michael Paul Smith, Esq. #23685
Melissa L. English, Esq. #19864
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, Maryland 21204
(410) 821-0070 / (410) 821-0071 (fax)
Email: mpsmith@sgs-law.com
Email: menglish@sgs-law.com
*Counsel for Plaintiffs*

Timothy F. Maloney, Esq. #03381
Drew B. LaFramboise, Esq. #20288
Samuel P. Morse, Esq. #21955
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
(301) 220-2200 / (301) 220-1214 (fax)
Email: tmaloney@jgllaw.com
Email: vnannis@jgllaw.com
Email: dlaframboise@jgllaw.com
Email: smorse@jgllaw.com
*Co-Counsel for Plaintiffs*

Table of Contents

I.    Introduction ................................................................................................ 1

II.   Facts Relevant to the Motion ...................................................................... 2

    A.   All Star designed the kickbacks to be regular, supported by "unit goals" of required loan referral quotas, and paid for by fraudulent charges to borrowers. ............................................ 2

    B.   The Home Point Class' RESPA claims all arise from Home Point's kickback agreement with All Star. ............................................................................................. 6

    C.   The Home Point Class Loans ............................................................... 13

    D.   The Home Point Class Representatives ............................................... 14

        1.    Proposed Home Point Class Representative Sandra Moyer ............................ 14

        2.    Proposed Home Point Class Representative Richard Martin ............................ 15

        3.    Proposed Home Point Class Representative Terry Patterson, Jr. ...................... 16

        4.    Proposed Home Point Class Representative Yvonne Mathews ..................... 17

III.  Argument ................................................................................................. 19

        1.    The Home Point Class is Ascertainable, and Plaintiffs are Members of the Proposed Class. ......................................................................................... 21

        2.    The Home Point Class Includes Borrowers on more than 400 Home Point Loans and, thus, is sufficiently numerous. ...................................................... 22

        3.    Plaintiffs' claims are typical of the claims of the Home Point Class. ......................... 23

        4.    Plaintiffs and Plaintiffs' Counsel will adequately protect the interest of the Home Point Class. ......................................................................................... 23

        5.    The Home Point Class shares common questions of law and fact, and these questions predominate ........................................................................... 24

        6.    A class action is superior to other methods for fair and efficient adjudication of Home Point Class members' claims. .............................................. 28

IV.   Conclusion ............................................................................................... 29

<u>Table of Authorities</u>

<u>Cases</u>

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) .................................................... 23, 24

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013)............................................ 27

*Baugh v. Fed. Sav. Bank*, No. SAG-17-1735, 2020 U.S. Dist. LEXIS 176190
    (D. Md. Sept. 25, 2020) ............................................................................ 20

*Bezek v. First Mariner Bank*, No. SAG-17-2902, 2020 U.S. Dist. LEXIS 183174
    (D. Md. Oct. 2, 2020).................................................................... 20, 23, 25

*Boley v. Brown*, 10 F.3d 218, 223 (4th Cir. 1993)........................................................ 19

*Boyd v. Coventry Health Care, Inc.,* 299 F.R.D. 451 (D. Md. 2014) .................................... 22, 24

*Brown v. Cameron-Brown Co.*, 92 F.R.D. 32 (E.D. Va. 1981)............................................ 19

*Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 143 F.R.D. 628 (D.S.C. 1992) ................................ 23

*Dameron v. Sinai Hosp. of Balt., Inc.*, 595 F. Supp. 1404 (D. Md. 1984)................................ 22

*Dobbins v. Bank of Am., N.A.*, No. SAG-17-0540, 2020 U.S. Dist. LEXIS 156315
    (D. Md. Aug. 28, 2020) ............................................................................ 20

*Edmondson v. Eagle Nat'l Bank*, No. SAG-16-3938, 2020 U.S. Dist. LEXIS 89690
    (D. Md. May 21, 2020) ............................................................................ 20

*Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535 (4th Cir. 2019) .................................... 27

*Esplin v. Hirschi*, 402 F.2d 94 (10th Cir. 1968) ........................................................ 19

*Fangman v. Genuine Title, LLC*, No. RDB-14-0081, 2016 U.S. Dist. LEXIS 154582
    (D. Md. Nov. 9, 2016)........................................................................ 20, 26

*Ginwright v. Exeter Fin. Corp.*, 280 F. Supp. 3d 674 (D. Md. 2017).................................... 28

*Hammond v. Powell*, 462 F.2d 1053 (4th Cir. 1972)........................................................ 21

*In re Catfish Antitrust Litig.*, 826 F. Supp. 1019 (N.D. Miss. 1993)............................................ 23

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008)........................................ 26

*In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74 (D. Md. 1991)........................................ 22

*In re Linerboard Antitrust Litig.*, 203 F.R.D. 197 (E.D. Pa. 2001) ........................................ 23

*In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328 (D. Md. 2012) ........................................ 26

*J.O.P. v. United States Dep't of Homeland Sec.*, 338 F.R.D. 33 (D. Md. 2020)........................ 21

*James v. Acre Mortg. & Fin., Inc.*, No. SAG-17-1734, 2020 U.S. Dist. LEXIS 96633
    (D. Md. June 2, 2020) ........................................................................ 20, 21, 26

*Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384 (M.D.N.C. 2015)........................................ 22

*Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643 (4th Cir. 2019) ................................ 21

*Palombaro v. Emery Fed. Credit Union*, No. 1:15-cv-792, 2017 U.S. Dist. Lexis 127022 (S.D.
    Ohio Aug. 10, 2016) ............................................................................ 20

*Peoples v. Wendover Funding*, 179 F.R.D. 492 (D. Md. 1998) ............................................ 23

*Somerville v. West Town Bank & Trust*, No. PJM-19-490 (D. Md. Feb. 11, 2021) .................... 20

*Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183 (E.D. Va. 2015) ........................................ 22

*Stanley v. Cent. Garden & Pet Corp.*, 891 F. Supp. 2d 757 (D. Md. 2012) ................................ 22

*Stott v. Haworth*, 916 F.2d 134 (4th Cir. 1990) ........................................................... 19

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ................................................. 25

<u>Regulations</u>

12 C.F.R. § 1024.7 ...................................................................................................... 15

12 C.F.R. § 1026.38 .................................................................................................... 15

2013 Integrated Mortgage Disclosures Rule Under the Real Estate Settlement Procedures Act
(Regulation X) and the Truth in Lending Act (Regulation Z) and Amendments; Delay of
Effective Date, 80 Fed. Reg. 43,911 (July 24, 2015) ................................................ 15

## I.    Introduction

This case arises from a kickback scheme between Home Point Financial Corporation, f/k/a Maverick Funding Corporation[1] ("Home Point") and All Star Title, Inc. ("All Star"), a defunct Maryland title and settlement services company. *See* Compl., ECF No. 3. Under the kickback scheme, Home Point agreed to assign and refer residential mortgage loans, refinances, and reverse mortgages to All Star for title and settlement services in exchange for kickbacks paid in violation of the Real Estate Settlement Procedures Act ("RESPA") 12 U.S.C. § 2607(a) ("Kickback Agreement"). Plaintiffs did not actively participate in choosing All Star as their title and settlement services company. To fund the illegal kickbacks, Home Point and All Star agreed to charge borrowers fraudulent and unnecessarily increased charges for title and settlement services.

All Star and Home Point's records show that Home Point assigned and referred hundreds of Home Point loans to All Star as a *quid pro quo* for the kickbacks. The borrowers on each of these Home Point loans were charged and paid fraudulent charges for title and settlement services, out of which Home Point was paid, received, and accepted thousands of dollars in kickbacks. The RESPA claims of the borrowers on the more than 400 Home Point loans are virtually identical and arise from the same kickback scheme such that common issues of fact and law predominate, and a class action is an efficient and just mechanism for resolving Home Point's liability. Accordingly, the Plaintiffs respectfully move the Court to certify the proposed Home Point Class pursuant to Federal Rule of Civil Procedure 23(b)(3).

---

[1] Home Point changed its name from Maverick Funding Corp in March, 2015 close to half-way through the relevant time period. *See* Ex. 34, Certification of Name Change. For clarity and simplicity, all references will be to Home Point.

## II.      Facts Relevant to the Motion

As All Star was going out of business, it consented to the Circuit Court for Baltimore County, Maryland, appointing a receiver ("All Star Receiver") to preserve its servers, business records, documents, and electronic information. Ex. 1, Order Appointing Receiver. Included in the records preserved by the All Star Receiver are hundreds of thousands of All Star's email communications, including those communications with Home Point's branch managers and loan officers administering, negotiating, and performing the kickback agreement at the heart of Plaintiffs', and the alleged Home Point Class', RESPA claims. These communications clearly illustrate the machinations of Home Point's and All Star's kickback agreement and demonstrate that the kickback agreement between Home Point and All Star was not unique. All Star had designed and refined kickbacks as a way of doing its business and had similar agreements with scores of other lenders.

### A.      All Star designed the kickbacks to be regular, supported by "unit goals" of required loan referral quotas, and paid for by fraudulent charges to borrowers.

All Star's President and owner Jason Horwitz designed the kickbacks All Star paid lenders to be like a business process: All Star would pay a kickback to a lender, laundered through a third party marketing company, and would require the lender receiving and accepting the kickback to refer a certain number of residential mortgages to All Star for title and settlement services before the next kickback would be paid. Horwitz describes the structure of the kickback scheme in his own words in an email to Dan Hart, an All Star marketing representative:

3) Production - Dropping 30k pieces I would hope they can pull out close to 30 loans for sure.  Also, just as a heads up, this is fairly expensive mail at .66/piece.  That being said, if we contribute 25%, it obvioulsy is SOOO much better and less risky.  However, what we're going to, and this really will apply to all marketing campaigns of any significant size, is basically place a "unit goal" on the mail drop.  Essentially we say, with this drop for example, that we're setting a reasonable "unit goal" of 25 units.  I think for 30k pieces this is very fair.  Also, the "unit goal" can be met with closings from the mail, or any other source.  It doesnt matter where its from, as long as we hit that unit number.  Basically the agreement would be that we do not contribute to another campaign until we hit that unit goal.  This basically ensures that we dont get burned.  Now, depending on their production, this may mean instead of dropping every month, its every 6 weeks (or whenever they hit the goal).  BUT, if we keep contributing month after month and they only close 10-15 loans, we're losing big time and wont be able to continue contributing.  Doing it this way allows us to continually market for them over and over.   They hit the goal, we do another campaign.  So

Ex. 2, June 22, 2010 email from All Star President J. Horwitz to All Star marketing rep. D. Hart. All Star marketing rep Dan Hart goes on in 2014 to be responsible, with others, for the administration of the kickback agreement between Home Point and All Star.

An essential part of the kickback scheme is the agreement between All Star and the participating lender to launder the kickbacks through third party marketing companies and to create an elaborate sham to create the false impression that All Star is making a legitimate payment to a marketing company for marketing services. But All Star does not receive any marketing services from the marketing company, and its payment is a kickback for the participating lender. The participating lender receives and accepts the kickbacks when All Star's payment is applied for the lender's benefit for marketing services the lender receives from the marketing company.

To deepen the concealment, All Star and the participating lender cause the marketing company to issue sham invoices that make it appear as if All Star is receiving marketing services for its payment even though it is not. Horwitz devises a method where the marketing company issues an invoice to the lender for the entire mail drop, and then issues an invoice to All Star for its balance – the amount of the kickback – which amount is applied for the sole benefit of the lender. Horwitz describes the method in a February, 2012, email to Influence Direct, a Tennessee-based marketing company used by lender Home Savings of America ("HSOA"):

| From: | Jason Horwitz |
|---|---|
| Sent: | Wednesday, February 22, 2012 3:55 PM EST |
| To: | jcrosslin@influencedirect.com |
| CC: | Dan Hart |
| Subject: | Byron - HSOA |

Hey Jeremy:

We're going to be taking care of half of the drop for Byron at HSOA. Can you split the invoice (showing Byron's payment), and send me an invoice showing the balance.

Thanks buddy



Jason Horwitz, President

Ex. 3, Feb. 22, 2012 email from All Star President J. Horwitz to marketing company Influence Direct. All Star uses the same method with participating lenders that are using the kickback to purchase "live transfer" leads:

> On May 15, 2013, at 3:58 PM, "Rob Selznick" <rob@allstartitle.com> wrote:
>
> > Scott,
> >
> > Essentially, if you want me to split a campaign with you, I need to get an invoice from Azevedo showing 10 leads being purchased. The invoice should show that you paid for 5 of them and that 5 of them are due to All Star. You also need to email Joe and also CC me giving authorization for All Star to have access to the CRM (the records of the leads being provided). I cannot reimburse you directly, the payment is made directly to the marketing source.
> >
> >
> >
> > Best Regards,
> >
> > Rob Selznick, Senior Account Manager

Ex. 4, May 15, 2013 email from All Star Marketing Rep R. Selznick to loan officer S. Lewandowski.

Another essential element of the kickback scheme, and kickback agreements with the lenders like Home Point participating in the kickback scheme, is that the participating lender and All Star agree to allow All Star to charge borrowers referred under the kickback agreement unnecessarily increased and fraudulent costs for title and settlement services to pay for the

kickbacks. All Star marketing rep Rob Selznick describes how All Star charges borrowers from lenders <u>not</u> receiving and accepting kickbacks less for the same title and settlement services than borrowers assigned and referred to All Star by lenders who are receiving kickbacks:

> If you chose **NOT** to utilize All Star's Marketing Plan, the title fees will be at the agreed upon price of $1000 including title insurance. Any deals that you send to us that are in unlicensed states (not on the attached list), the fee structure will be $1000 **PLUS** Title Insurance. I think everyone was kind of in agreement that we most likely not be seeing these deals moving forward. All orders already placed will remain at the original agreed upon structure. This is for all new submissions moving forward.
>
> If you chose to **UTILIZE** All Star's Marketing Plan, the title fees will be determined on an individual basis based on past performance. All marketing must be done in licensed states. The marketing plan will move in 30 day windows. We want to keep the marketing completely uniform for everyone; therefore if you choose to market with us, we will pay for 2,000 pieces per week for 4 weeks or roughly $1000 per person, per week. The expected return for this investment will be 12 **CLOSED** loans before any more marketing continues. Hopefully, this is

Ex. 5, Sept. 15, 2010 email from R. Selznick to various loan officers. All Star kept track of each participating lender's title fee price agreement on Title Fee Structure charts. *See* e.g., Ex. 6, Title Fee Structure Effective 01/13/14.

In many instances the participating lender and All Star agree that a certain portion of the charge for title and settlement services is for the sole purpose of funding kickbacks and is not associated with any legitimate title or settlement service:

> **From:** Rob Selznick
> **Sent:** Monday, May 23, 2011 2:49 PM
> **To:** Jason
> **Subject:** RE: expenses
>
> Yes, that will be the exact amount every month. Just closed a deal with him this month and have another in the pipeline to close next month. I am gonna have Yeager bump his structure up to cover marketing costs.

Ex. 7, May 23, 2011 email from All Star Marketing Rep. R. Selznick to All Star President J. Horwitz. Often the amounts were specific, directly linked to the kickbacks, and agreed to by All Star and the participating lender:

| From: | Jason |
|---|---|
| Sent: | Tuesday, August 16, 2011 12:41 PM EDT |
| To: | ccasazza@westtownsb.com; berickson@westtownsb.com |
| Subject: | stamps |
| Attachments: | Licensed States.pdf, NewLogo.JPG |

hey guys,

Brent - you and I spoke last week about really trying to take advantage of the low rates right now and step things up with the stamps. I'm completely happy to do that and hope we can really get things ramped up. I'll increase the stamps to 3,000/week, so thats a total of 12k pieces that will go out every month, pretty good.

I'd like to bump the fees by $250. This will give me the room to make this increase possible. Also, I'm sure I've sent you this before, but I just wanted to make sure, we need to keep our marketing to the attached list of licensed states. Basically, outside of the states on this list, we make next to nothing, which obviously means there isnt any profit for me to be able to put back into more stamps.

With the stamps up to 3k/week and rates like they are, how many closings do you guys think I would expect to see?

Ex. 8, Aug, 14, 2011 email from All Star President J. Horwitz to West Town Bank & Trust loan officers C. Casazza and B. Erickson.

**B.     The Home Point Class' RESPA claims all arise from Home Point's kickback agreement with All Star.**

Based on the documents preserved with the All Star Receiver, the kickback agreement at the center of the Plaintiffs' and alleged Home Point Class', RESPA claims begins in May, 2014 when Home Point sales manager Ami Desai reaches out and asks All Star marketing rep Dan Hart if he would like to meet because "we have some marketing ideas we want to go over with you…". Ex. 9, May 30, 2014 email from Home Point sales manager A. Desai to All Star marketing rep D. Hart. Desai was familiar with All Star's practice of kickback agreements from her time as a loan officer at HSOA in a branch receiving and accepting kickbacks from All Star. See, e.g., Ex. 10, May 17, 2011 email from All Star marketing rep R. Selznick to various HSOA loan officers including A. Desai. Hart and Desai meet, and in the following month Home Point assigns and refers at least three loans to All Star for title and settlement services. Ex. 19, Home Point Class Loan Spreadsheet at column SETTLEMENT_DATE equals 6/1/2014 to 6/30/2014.

6

All Star launders a kickback payment to Home Point in July, 2014, less than a month after Desai first contacts All Star. Desai identifies that Home Point will be receiving marketing services from Viatele, a Maryland based marketing company. All Star marketing rep Dan Hart instructs Desai on the invoicing scheme used to conceal the kickback:

| | |
|---|---|
| **From:** | /O=FIRST ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=DAN |
| **Sent:** | Wednesday, July 9, 2014 10:44 AM EDT |
| **To:** | Ami Desai |
| **CC:** | John Sebeck |
| **Subject:** | RE: Marketing |
| **Attachments:** | image001.jpg, image002.jpg |

Have the company create a invoice and within that invoice have then split the amount between us and you. Than have them send a me a credit card Authorization form and I will send it up for approval.
Dan Hart
National Account Executive

Ex. 11, July 9, 2014 email from All Star Marketing Rep D. Hart to Home Point Sales Manager A. Desai.

Later in that same month of July, 2014, Home Point receives and accepts another kickback paid by All Star, again laundered through Viatele and following All Star's instructions for "split invoices" to conceal the kickbacks. Ex. 12, July 26, 2014 email correspondence between Home Point sales manager A. Desai, Home Point branch manager J. Sebeck, All Star marketing rep D. Hart and Viatele owner W. Wingo; Ex. 13, July 28, 2014 Split Invoices. The invoices were a sham because they falsely represented that All Star received 20 live transfer calls and 40 email leads from LBE/Viatele. In fact, All Star did not receive any marketing services from LBE/Viatele. In July and August 2014, Home Point referred at least thirteen loans to All Star as quid pro quo for the kickbacks. Ex. 19.

The documents preserved by the All Star Receiver establish kickbacks received and accepted by Home Point across multiple branches and continuing through at least November, 2015 with a kickback laundered through MISTiD. The extent of the kickbacks Home Point

received and accepted from All Star is put on full display when a dispute breaks out among All

Star's marketing reps about which rep gets to claim which Home Point branch, with All Star

marketing rep Dan Hart claiming:

> The Sebeck team is mine: Christian, Deshak and Jason and those guys.  I do EXTENSIVE marketing with them and have had them as a client now for months.  No hard feelings but I am responsible  for their numbers. The Maverick team that works out of my office is mine as well. IT has taken me a long time to cultivate this client and yes they recruited out of some of your clients but now they are mine.  I am doing marketing with both Maverick and the Sebeck team.

Ex. 14, Oct. 30, 2014 email from All Star marketing rep D. Hart to All Star marketing rep R.

Selznick. In a follow up email Hart describes the amount of kickbacks Home Point is receiving

and accepting:

> Who went to direct ? I never got a single deal from one of your guys. You are not asking about splitting at this point and You never did. How can you ask me to split a shop that I was working with when two of your guys were hired?   We all know the story of Ray. The Agent team is not up for discussion as I spend 1500 a month on their marketing an have to work with them for months. When you had this issue with Alex you gave him a guy you took. Thomas AND Ron's  referral business can be a discuss as I am marketing with Maverick  as well.  let's discuss that then.
>
> Dan Hart
> 410-963-7834
> Dan@allstartitle.com

*Id.* Hart identifies the Home Point loan officers assigning and referring Home Point loans in

exchange for the kickbacks with specificity:

| From: | Dan Hart |
| --- | --- |
| Sent: | Thursday, October 30, 2014 3:14 PM EDT |
| To: | Alex Goloborodko |
| CC: | Rob Selznick |
| Subject: | RE: Overlapping clients |

You two agreed to the below scenario in the past so it should be a easy fix. Rob the Agents working out of office are all on my marketing and have been for 4 months. We have done Mailers and live transfers for Maverick but Ron and Thomas are your boys. There self Gen will be yours.

Do we need to get Jason to make a final ruling or are we going to stay consistent with what was fair

Here is the roster of my LO's
Ami Desai
Ronald Sebeck sr
Ronald Sebeck jr
Ronald Riccetelli
Thomas Bowen
Omar Smith
Michael Hecht
Reynard Taylor
Brian Keehn
Brad Restivo

They also have Ryan Sebeck Christian Dershak and Jason  and a new girl all on my marketing

*Dan Hart*

Ex. 15, Oct. 30, 2014 email amount All Star employees D. Hart, A. Golobrodoko, and R. Selznick.

Consistent with the All Star marketing reps characterization of the kickbacks paid, Home Point regularly assigns and refers loans in fulfillment of its responsibility under the kickback agreement:

| Month | Loans Referred | Exhibit |
| --- | --- | --- |
| June, 2014 | 3 | 19 |
| July, 2014 | 6 | 19, 20 |
| August, 2014 | 7 | 19, 20 |
| September, 2014 | 12 | 19, 20 |
| October, 2014 | 16 | 19, 20 |
| December, 2014 | 21 | 19, 20 |

| January, 2015 | 26 | 19, 20 |
| February, 2015 | 22 | 19, 20 |
| March, 2015 | 9 | 19, 20 |
| April, 2015 | 5 | 20 |
| May, 2015 | 3 | 19, 20 |
| June, 2015 | 1 | 20 |
| July, 2015 | 7 | 19, 20 |
| August, 2015 | 25 | 19, 20 |
| September, 2015 | 75 | 19, 20 |
| October, 2015 | 81 | 19, 20 |
| November, 2015 | 83 | 19, 20 |
| December, 2015 | 78 | 19, 20 |
| January, 2016 | 61 | 19, 20 |
| February, 2016 | 94 | 19, 20 |

As with the other lenders with a kickback agreement with All Star, Home Point and All Star agree to allow All Star to charge Home Point borrowers assigned and referred to All Star by Home Point under the kickback agreement purported title and settlement services high enough to fund the illegal kickbacks. These agreements are captured on the charts that All Star used to track the individual agreements it made with lenders that were receiving and accepting kickbacks. *See, e.g.,* Ex. 35, Title Fee Structure Sheets from D. Hart, Sept. 2014, and R. Selznick, Nov., 2015.

In addition, the documents preserved with the All Star Receiver, document these agreements. For example, in October, 2014, Home Point Sales Manager Desai agrees to allow All Star to charge borrowers on loans assigned and referred to All Star under the kickback agreement $995.00, plus title and settlement services—a price set artificially high in order to fund the kickback. Ex. 16, Oct. 31, 2014 email correspondence between Home Point sales manager A. Desai and All Star marketing rep D. Hart. The amount charged to fund the kickback to Home Point was not associated with any legitimate title or settlement service.

Home Point and All Star continued to develop the kickback agreement and fraudulent charges over time. On November 12, 2014, All Star national marketing representative Dan Hart stated in an email that borrowers on Home Point loans referred in performance of the kickback agreement must be charged no less than "$895.00 plus title insurance" costs to fund the kickbacks. See e.g., Ex. 17, Nov. 12, 2014 email from All Star marketing rep D. Hart to All Star marketing rep R. Selznick. These title and settlement service charges were unnecessarily increased to fund the kickbacks paid to Home Point, and includes amounts not associated with any legitimate title or settlement service.

In addition to the charges for title and settlement services like a title exam or subtract, one purpose of the kickbacks was to for All Star to capture the premium from title insurance charges on the Home Point loans referred under the kickback agreement. When discussing how much in fraudulent charges should be applied to certain Home Point loans involving transactions in Florida, All Star president Jason Horwitz expressed that "premiums need to be plenty high for [the kickback agreement] to make sense." Ex. 19, Nov. 13, 2014 email from All Star President J. Horwitz to All Star marketing rep D. Hart. Dan Hart subsequently sets a minimum amount of $1,400 to be charged to borrowers for purported title and settlement services on loans referred by

11

Home Point in performance of the Kickback Agreement. *Id.* This is a price set artificially high in order to fund the kickback, and which was not associated with any legitimate title or settlement service.

During the lifespan of the kickback agreement, Home Point and All Star built misrepresentations into borrowers' loan documents to conceal both the kickbacks and the fraudulent amounts charged to fund the kickbacks. The concealment started with the borrowers Good Faith Estimate which Home Point was required to issue to the borrower within three days of receiving the loan application.12 C.F.R. § 1024.7 (a)–(b). Box 4 of the "Good Faith" Estimate is to include only those charges for "title services and lender's title insurance." *Id.* Home Point routinely included in Box 4 the fraudulent amounts that were being charged to fund the illegal kickbacks and were not associated with any legitimate title or settlement services.

Home Point's false representations on borrowers' HUD-1s and Closing Disclosures[2] were perhaps more direct. Home Point and All Star chose to omit any disclosure of the kickbacks or the fraudulent amounts being charged to fund the kickbacks from borrowers' HUD-1s and Closing Disclosures, even though lines were provided and could have been used for exactly that purpose in the 800, 1100, and 1300 series of lines. *See, e.g.,* Ex. 21, Moyer HUD-1 at Lines 800-808, 1100-1110, 1300-1305. In addition, Home Point again allowed All Star to lump the fraudulent amounts being charged to fund the kickbacks into and label them as seemingly legitimate title and settlement services, often title examination, title abstract, and/or settlement

---

[2] On October 3, 2015, federal regulations went into effect replacing the HUD-1 with a form known as the Closing Disclosure. 12 C.F.R. § 1026.38; 2013 Integrated Mortgage Disclosures Rule Under the Real Estate Settlement Procedures Act (Regulation X) and the Truth in Lending Act (Regulation Z) and Amendments; Delay of Effective Date, 80 Fed. Reg. 43,911 (July 24, 2015). Functionally similar to the HUD-1, the Closing Disclosure includes final details as to the title and settlements services, and related charges, for the subject loan. *See* 12 C.F.R. § 1026.38.

fee. *See, e.g.,* Ex. 21, Moyer HUD-1 at Line 1109-1110. These direct misrepresentations concealed the kickbacks from borrowers, and prevented borrowers from learning either before, at, or after their closing that they were charged and paid amounts that were not associated with any legitimate title and settlement service. Home Point reviewed and approved every HUD-1 before it was presented at closing to a borrower, effectively ratifying every false representation appearing on a Home Point Class member's HUD-1.

### C.    The Home Point Class Loans

Included in the business records lodged with the All Star Receiver is data from Title Express, a title industry-standard software package that All Star used to process and close loans assigned and referred by lenders participating in kickback agreements, including loans from Home Point. All Star's Title Express records identify 444 loans assigned and referred to All Star by Home Point during the time period of the kickback agreement with a recorded settlement date, an indication that the transaction closed. The borrowers on these loans are the minimum number of members in the alleged Home Point Class. Ex. 19, Home Point Class Loan Spreadsheet.

All Star's Title Express records identify the Home Point loans and class members with specificity, including by name, social security number, mailing address, address of the secured property, telephone number and, in many instances, by Home Point loan number.[3] In the course of discovery Home Point identified an 225 additional Home Point loans assigned and referred to

---

[3] Concurrent with filing this motion Plaintiffs have moved to seal Exhibits 19 and 20 because the spreadsheets contains personally identifying, non-public financial information of non-parties. In addition, the Home Point Class Loan Spreadsheet provides so much data related to each transaction it is an unwieldy printed document. It contains more than 400 rows and 200 columns of data; therefore, Plaintiffs have provided an excerpted and redacted versions of Ex. 19 and 20 with this Memorandum and will submit complete electronic copies of both spreadsheets to the Court.

All Star by Home Point during the time period of the kickback agreement. *See* Ex. 20, Home Point Additional Class Loan Spreadsheet.  Home Point admits that it has loan records of these loan transactions with information sufficient to support administration of notice to the borrowers on these transactions.

Together these two spreadsheets represent the likely maximum membership of the alleged Home Point Class. The borrowers on these 669 Home Point loans suffered direct financial harm, and Home Point with its branch managers and loan officers benefited at these borrowers' expense. Each of the borrowers in the proposed Home Point Class are victims of this illegal scheme, have identical claims against Home Point, and are entitled to damages.

### D.    The Home Point Class Representatives

The proposed Home Point Class Representatives are Plaintiffs Sandra Moyer, Richard Martin. Terry Patterson, Jr., and Yvonne Matthews. The proposed class representatives appear in the Home Point Loans Spreadsheets and are members of the Home Point Class.

#### 1.    Proposed Home Point Class Representative Sandra Moyer

Sandra Moyer obtained a federally related VA residential mortgage loan from Home Point loan officer and sales manager Ami Desai, in relation to the refinance of her residential real property and principal residence located at 2307 Shannon Road, Edgewood, MD 21040. Ms. Moyer's Home Point loan settled on November 21, 2014 with Home Point as the lender on the loan which was secured by a first position lien on that residential property. *See* Ex. 21, Moyer HUD-1.

Home Point loan officer Desai assigned and referred Ms. Moyer's loan to All Star in performance of the Kickback Agreement as a *quid pro quo* for the kickbacks Home Point received in July and August, 2014. Home Point allowed All Star to charge Ms. Moyer $1,199.31

in total title and settlement service fees for her Home Point loan. These charges include amounts

not associated with a any legitimate title or settlement services and are charged for the purpose of

funding the illegal kickbacks paid by All Star to Home Point. Home Point and All Star falsely

allocated the fraudulent amounts by lumping them into charges for seemingly legitimate title and

settlement services, such as "title exam" and "title abstract." Ex. 21, Moyer HUD-1 at Lines

1109 and 1110.  Ms. Moyer paid for these charges when All Star disbursed proceeds from Ms.

Moyer's loan originated by Home Point.

Home Point issued both of the Good Faith Estimates associated with the Moyer

transaction. Ex. 22, Moyer Good Faith Estimates. On both of the Moyer Good Faith Estimates,

Home Point concealed the fraudulent amounts charged to fund the illegal kickbacks in Box 4,

making it appear as if that amount was associated with seemingly legitimate title and settlement

services. *Id.* These false representations were repeated on Ms. Moyer's HUD-1 wherein Home

Point omitted any disclosure of the kickbacks or the fraudulent amounts charged to fund the

kickbacks from Sections 800, 1100, and 1300. *See* Ex. 21, Moyer HUD-1 at Section 800, 1100

and 1300.

Home Point reviewed and approved Ms. Moyer's HUD-1 as a condition of closing,

ratifying every false representation and fraudulent charge appearing on the same. Home Point

falsely certified to Ms. Moyer that the charges associated with the loan were permitted by the

VA.

### 2.    Proposed Home Point Class Representative Richard Martin

Richard Martin obtained a federally related residential mortgage loan in relation to the

refinance of his residential real property and principal residence located at 1104 Lucabaugh Mill

Road, Westminster, MD 21157, through Home Point loan officer Ron Sebeck. Mr. Martin's

Home Point loan settled on October 31, 2014, with Home Point as the lender on the loan, which was secured by a first position lien on that real property.

Home Point loan officer Sebeck assigned and referred Mr. Martin's loan to All Star in performance of the kickback agreement and as a *quid pro quo* for the kickbacks Home Point received in July and August, 2014. Home Point allowed All Star to charge Mr. Martin $1,504.83 in total title and settlement service fees for his Home Point loan. *See* Ex. 23, Martin HUD-1. These charges include amounts not associated with any legitimate title or settlement service and charged for the purpose of funding the illegal kickbacks paid by All Star to Home Point. Home Point and All Star falsely allocated the fraudulent amounts lumping them into charges for "title exam." Ex. 23, Martin HUD-1 at Line 1109. Mr. Martin paid for these charges when All Star disbursed proceeds from Mr. Martin's loan originated by Home Point.

Home Point issued Mr. Martin's Good Faith Estimate. Ex. 24, Martin Good Faith Estimate. Home Point concealed the fraudulent amounts charged to fund the illegal kickbacks in Box 4, making it appear as if that amount only included legitimate title and settlement services. These false representations were repeated on Mr. Martin's HUD-1 where Home Point omitted any disclosure of the kickbacks or the fraudulent amounts charged to fund the kickbacks from Sections 800, 1100, and 1300. Ex. 23, Martin HUD 1 at Sections 800, 1100 and 1300.

Home Point reviewed and approved Mr. Martin's HUD-1 as a condition of closing, effectively ratifying every false representation and fraudulent charge appearing on the same.

### 3. Proposed Home Point Class Representative Terry Patterson, Jr.

Terry Patterson, Jr obtained a federally related residential mortgage in relation to the refinance of his residential real property and principal residence located at 3458 Millers Station Road, Manchester, MD 21102, through Home Point loan officer Ron Sebeck. Mr. Patterson's

Home Point loan settled on September 23, 2014, with Home Point as the lender on the loan, which was secured by a first position lien on that real property.

Home Point loan officer Sebeck assigned and referred Mr. Patterson's loan to All Star in performance of the Kickback Agreement and as a quid pro quo for the kickbacks Home Point received in July and August, 2014. Home Point allowed All Star to charge Mr. Patterson $1,230.15 in total title and settlement service fees for his Home Point loan. Ex. 25, Patterson HUD-1. These charges include amounts not associated with any legitimate title or settlement services and are charged for the purpose of funding the illegal kickbacks paid by All Star to Home Point. Home Point and All Star falsely allocated the fraudulent amounts lumping them into charges for "abstract" and "settlement fee." Ex. 25, Patterson HUD-1 at Lines 1109 and 1102. Mr. Patterson paid for these charges when All Star disbursed proceeds from Mr. Patterson's loan originated by Home Point.

Home Point issued Mr. Patterson's Good Faith Estimates. Ex. 26, Patterson Good Faith Estimates. Home Point concealed the fraudulent amounts charged to fund the illegal kickbacks in Box 4, making it appear as if that amount only included legitimate title and settlement services. These false representations were repeated on Mr. Patterson's HUD-1 where Home Point omitted any disclosure of the kickbacks or the fraudulent amounts charged to fund the kickbacks from Sections 800, 1100, and 1300. Ex. 25, Patterson HUD -1 at Sections 800, 1100, and 1300. Home Point reviewed and approved Mr. Patterson's HUD-1 as a condition of closing, effectively ratifying every false representation and fraudulent charge appearing on the same.

### 4. Proposed Home Point Class Representative Yvonne Mathews

Ms. Yvonne Mathews obtained a federally related residential mortgage loan in relation to the refinance of her residential real property and principal residence located at 3102 Barclay

Street, Baltimore, MD 21218, through Home Point loan officer Joseph Truesdale. Ms. Mathews' loan settled on September 4, 2014, with Home Point as the lender and secured by a first position lien on that real property.

Home Point loan officer Truesdale assigned and referred Ms. Mathews' loan to All Star in performance of the Kickback Agreement and as a quid pro quo for the kickbacks Home Point received in August 2014.[4] Home Point allowed All Star to charge Ms. Mathews $1,515.75 in total title and settlement service fees for her Home Point loan. Ex. 28, Mathews HUD-1. These charges include amounts not associated with any legitimate title or settlement services and are charged for the purpose of funding the illegal kickbacks paid by All Star to Home Point. Home Point and All Star falsely allocated the fraudulent amounts lumping them into charges for "settlement fee." Ex. 28, Matthews HUD-1 at Line 1102. Ms. Mathews paid for these charges when All Star disbursed proceeds from Ms. Mathews' loan originated by Home Point.

Home Point issued Ms. Mathews the Good Faith Estimate. Ex. 29, Mathews Good Faith Estimate. Home Point concealed the fraudulent amounts charged to fund the illegal kickbacks in Box 4 making it falsely appear that the amount included charges for only legitimate title and settlement services. These false representations were repeated on Ms. Mathew's HUD-1, where Home Point omitted from Section 800, 1100, and 1300 any disclosure of the kickbacks or the fraudulent amounts charged to fund the kickbacks. Ex. 28 at Sections 800, 1100, and 1300.

Home Point reviewed and approved Mr. Matthews' HUD-1 as a condition of closing, effectively ratifying every false representation and fraudulent charge appearing on the same.

---

[4] The documents preserved by the All Star Receiver include the email in which Home Point loan officer Joseph Truesdale assigns and refers Ms. Matthews loan to All Star through loan processor Jen Zamenski. Ex. 27, Aug. 22, 2014 email from Home Point loan processor J. Zamenski to All Star processor A. Baumgartner and All Star marketing rep A. Goloborodko.

### III.    Argument

To certify a class action under Rule 23(b), the proposed class must first satisfy all prerequisites of Rule 23(a). In addition to the implicit requirement of ascertainability, the prerequisites of Rule 23(a) are (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. The determination of whether a proposed class meets the requirements of Fed. R. Civ. P 23 is "within the discretion of the district court and will be reversed only upon a showing of abuse of that discretion." *Boley v. Brown*, 10 F.3d 218, 223 (4th Cir. 1993) (citing *Stott v. Haworth*, 916 F.2d 134, 139 (4th Cir. 1990). "Generally . . . where doubts exist as to the advisability of proceeding with a class action they should be resolved in favor of class certification." *Brown v. Cameron-Brown Co.*, 92 F.R.D. 32, 49 (E.D. Va. 1981) (citing *Esplin v. Hirschi*, 402 F.2d 94 (10th Cir. 1968)).

### A.    The Home Point Class Definition

Plaintiffs propose the following Home Point Class:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated by, brokered by, and/or otherwise obtained from Home Point Financial Corporation f/k/a Maverick Funding Corporation, for which All State Title, Inc., provided settlement service, as identified on the borrowers HUD-1 or Closing Disclosure, between January 1, 2014 and February 29, 2016. Exempted from this class is any person who, during the period between January 1, 2014 and February 29, 2016 was an employee, officer, member, and/or agent of Home Point Financial, Maverick Funding Corporation, or All Star Title, Inc.

The proposed Class is appropriate under Fed. R. Civ. P. 23.

Recently, this Court, the Hon. Peter J. Messitte presiding certified a virtually identical class in another case involving a different lender and All Star Title, and similar RESPA claims.

*See Somerville v. West Town Bank & Trust*, No. PJM-19-490, ECF No. 93 (D. Md. Feb. 11, 2021).[5]

In addition, multiple RESPA classes with virtually identical definitions as the Home Point Class proposed here have been certified in this District and throughout the nation. *See Fangman v. Genuine Title, LLC*, No. RDB-14-0081, 2016 U.S. Dist. LEXIS 154582, at *44 (D. Md. Nov. 9, 2016); *Palombaro v. Emery Fed. Credit Union*, No. 1:15-cv-792, 2017 U.S. Dist. Lexis 127022, at *10 (S.D. Ohio Aug. 10, 2016); *Edmondson v. Eagle Nat'l Bank*, No. SAG-16-3938, 2020 U.S. Dist. LEXIS 89690, at *25 (D. Md. May 21, 2020); *James v. Acre Mortg. & Fin., Inc.*, No. SAG-17-1734, 2020 U.S. Dist. LEXIS 96633, at *34 (D. Md. June 2, 2020); *Dobbins v. Bank of Am., N.A.*, No. SAG-17-0540, 2020 U.S. Dist. LEXIS 156315, at *24–25 (D. Md. Aug. 28, 2020); *Baugh v. Fed. Sav. Bank*, No. SAG-17-1735, 2020 U.S. Dist. LEXIS 176190, at *29 (D. Md. Sept. 25, 2020); *Bezek v. First Mariner Bank*, No. SAG-17-2902, 2020 U.S. Dist. LEXIS 183174, at *26–27 (D. Md. Oct. 2, 2020).

## B.    The Home Point Class Satisfies All Rule 23 Criteria.

The proposed class meets the necessary criteria required by Rule 23. First, the proposed class meets the prerequisites of Rule 23(a) there is: (1) numerosity of parties; (2) commonality of factual issues and legal issues; (3) typicality of claims and defenses of class representatives; and (4) adequacy of representation. *See* Fed. R. Civ. P. 23 (a). Second, the class action falls within

---

[5] Similar classes have been certified for settlement purposes by this Court. *Ekstrom v. Congressional Bank*, No. 1:20-cv-01501-ELH, ECF Doc. 48 (October 28, 2021) (order granting final approval); *Avery v. J.G. Wentworth Home Lending, LLC*, No. 8:19-cv-03303-TJS, ECF No. 41 (D. Md. June 24, 2021) (order granting final approval); *Donaldson v. Primary Residential Mortg.*, No. ELH-19-1175, 2021 U.S. Dist. LEXIS 101625 (D. Md. May 28, 2021) (order granting final approval); *accord, Walls v. Sierra Pacific Mortg. Co.,* No. 1:19-cv-00595-GLR, ECF No. 47 (D. Md. August 19, 2021) (order granting preliminary approval and certification).

the purview of Rule 23(b)(3) as common issues predominate over individual ones and the class action is superior to other available methods of adjudication. Each will be addressed in turn.

      **1.    The Home Point Class is Ascertainable, and Plaintiffs are Members of the Proposed Class.**

This Circuit has recognized the "that Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable'" *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (quoting *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972)). "The goal of the 'readily identifiable' requirement is 'to define a class in such a way as to ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point.'" *J.O.P. v. United States Dep't of Homeland Sec.*, 338 F.R.D. 33, 49 (D. Md. 2020) (quoting *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019)). A class may be certified if "a court can readily identify the class members in reference to objective criteria." *Adair*, 764 F.3d at 358.

The Home Point Class has a clear definition grounded in reference to objective criteria. A class member is identified by the objection criteria of obtaining a loan from Home Point during a limited definite time period. The information linking the transaction to All Star is required to be recorded on the HUD-1 or Closing Disclosure, disclosures that are mandated by federal regulation.

As a practical matter, the members of the Home Point Class have already been ascertained and identified with particularity in the Home Point Class Loan Spreadsheet drawn from All Star's business records and Title Express loan processing data and the additional transactions identified by Home Point from its loan records. The members of the Class have already been ascertained; therefore, it is administratively feasible to provide them with notice. *See, e.g., James,* 2020 U.S. Dist. LEXIS 96633 at *13 (relying on virtually identical Title

Express data to conclude that "in essence, then, each class member has already been ascertained."); *accord, Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183,196–97 (E.D. Va. 2015) (class was ascertainable were list of class members could be derived from defendant's records); *Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 393 (M.D.N.C. 2015) (same).

The proposed class representatives are members of the Home Point Class. Ms. Moyer, Mr. Martin, Mr. Patterson, and Ms. Mathews appear in All Star's Title Express data as obtaining loans from Home Point during the relevant time period. Each obtained a federally related loan from Home Point during the defined time period and All Star performed title and settlement services for the transaction, as recorded on the HUD-1s for all the proposed class representatives.

Accordingly, the threshold and implicit requirements of Rule 23 are met.

### 2. The Home Point Class Includes Borrowers on more than 400 Home Point Loans and, thus, is sufficiently numerous.

The Home Point Class is sufficiently numerous such that joinder would be impracticable. *Stanley v. Cent. Garden & Pet Corp.*, 891 F. Supp. 2d 757, 770 (D. Md. 2012) (quoting *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 78 (D. Md. 1991)) ("Classes of as few as 25 to 30 have been found to 'raise[] the presumption that joinder would be impracticable.'"); *Dameron v. Sinai Hosp. of Balt., Inc.*, 595 F. Supp. 1404, 1408 (D. Md. 1984) ("Courts generally consider in addition to the size of the class, the geographic diversity of class members, the difficulty of identification, and the negative impact on judicial economy if individual suits were required."). The Home Point Class includes the borrowers on more than 400 transactions secured by property across the country. *See Boyd v. Coventry Health Care, Inc.,* 299 F.R.D. 451, 458 (D. Md. 2014) ("When a class is large - as is the case here - the numbers alone may allow the court to presume impracticability of joinder."). Numerosity is met.

22

### 3. Plaintiffs' claims are typical of the claims of the Home Point Class.

Fed. R. Civ. P. 23(a)(3) requires the proposed class representatives' claims be typical of the class they seek to represent. "The test for determining typicality is whether the claim or defense arises from the same course of conduct leading to the class claims, and whether the same legal theory underlies the claims or defenses." *Peoples v. Wendover Funding*, 179 F.R.D. 492, 498 (D. Md. 1998) (citing *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 143 F.R.D. 628, 637 (D.S.C. 1992)). "Moreover, 'in instances wherein it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members.'" *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 207 (E.D. Pa. 2001) (quoting *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1035 (N.D. Miss. 1993)); *see also Fangman*, 2016 U.S. Dist. LEXIS 154582 at *32–35 (typicality met with claims arising from the same conduct); *Bezek ,* 2020 U.S. Dist. LEXIS 183174, at *23 (same).

Here, Plaintiffs allege the same violations of 12 U.S.C. § 2607(a) as every other member of the Home Point Class arising from the same kickback agreement. Plaintiffs' claims arise from the same fact pattern for fraudulent concealment tolling alleged by the entire Home Point Class. It is this course of conduct by Home Point with each borrower and the same kickback agreement that led to the Home Point Class member's individual claims. Typicality is met.

### 4. Plaintiffs and Plaintiffs' Counsel will adequately protect the interest of the Home Point Class.

Federal Rule of Civil Procedure 23(a)(4) questions whether "the representative parties will fairly and adequately protect the interests of the class." This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997). "Representation is adequate if: (1) the named plaintiff's

23

interests are not opposed to those of other class members, and (2) the plaintiff's attorneys are qualified, experienced, and capable." *Boyd*, 299 F.R.D. at 459. The proposed Class Representatives and Class Counsel will adequately protect the interests of the Home Point Class.

Plaintiffs' claims are virtually identical to those of all members of the Home Point Class. Plaintiffs' injuries arose from the same kickback agreement, they suffered the same injuries, they have the same remedies, and they must prove the same underlying facts. Each Home Point Class members' damages are independent of every other claim, so there is no risk of antagonistic interest developing between Plaintiffs and the Class members. There is no conflict of interest between Plaintiffs and the Class members, therefore, each will adequately represent the interests of the Class members.

The adequacy of counsel inquiry focuses on counsel's competence and experience. *Amchem*, 521 U.S. at 625. Counsel in this case—Michael Paul Smith and Melissa L. English and the law firm of Smith Gildea & Schmidt, and Timothy Maloney and Drew LaFramboise and the law firm of Joseph Greenwald & Laake—routinely practice in the areas of complex commercial litigation and class actions and have been appointed as class counsel in numerous state and federal courts. *See* Exs. 30-33, Declarations of Counsel. Plaintiffs' Counsels' track record demonstrates competence, diligence, and a desire to prosecute claims vigorously on behalf of the Home Point Class.

Both the proposed class representatives and counsel meet the adequacy requirement of Rule 23(a)(4).

> **5.    The Home Point Class shares common questions of law and fact, and these questions predominate.**

Federal Rule of Civil Procedure 23(a)(2) requires that there be "questions of law or fact common to the class," and Federal Rule of Civil Procedure 23(b)(3) requires that these common

issues "predominate over any questions affecting only individual members." The predominance inquiry parallels the commonality requirement, but also focuses "on how those questions relate to the controversy at the heart of the litigation." *Adair*, 764 F.3d at 366. In other words, the predominance requirement is met when the claims depend on common issues and establishing the "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

<blockquote>

**i.    Common questions predominate across the Home Point Class because the claims of the Home Point Class arise from a single course of wrongful conduct.**

</blockquote>

Plaintiffs allege that Home Point violated 12 U.S.C. § 2607(a) in an identical way as to each Home Point Class member. The kickback agreement between Home Point and All Star is part of a single course of wrongful conduct that is at the heart of this litigation. "Whether this widespread scheme existed and, if so, how it was executed are common questions 'at the heart of the litigation' that will produce common answers." *Bezek*, 2020 U.S. Dist. LEXIS 183174, at *15 (quoting *Adair*, 764 F.3d at 366). The factual issues of the existence and implementation of the kickback agreement are fact issues shared by all members of the Home Point Class and predominate over any issue related to any individual class member's claims. *See Adair*, 764 F.3d at 366.

<blockquote>

**ii.    Common legal and factual issues predominate across the Home Point Class.**

</blockquote>

The common issues stretching across the claims of the Home Point Class include the factual issue of the existence of the kickback agreement, the payment by All Star and receipt and acceptance by Home Point of things of value in furtherance of the kickback agreement, and the actual referral of loans by Home point to All Star pursuant to the quid pro quo at the heart of the kickback agreement. Home Point Class members suffered the same injury, and will share a

common measure of statutory damages. 12 U.S.C. § 2607(d)(2). These common questions relate to Home Point's course of conduct predominate over any individual fact issues related to each Class Member's transaction. *See James*, 2020 U.S. Dist. LEXIS 96633, at *20 (collecting cases).

RESPA violations are well suited for class resolution because the class may prove their claims by circumstantial evidence of a "practice, pattern[,] or course of conduct," such that "when a thing of value is received repeatedly and is connected in any way with the volume or value of the business referred, the receipt of the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business." 12 C.F.R. § 1024.14(e); *Freeman v. Quicken Loan, Inc.*, 566 U.S. 624, 635-36 (2012) ("thing of value" underlying a RESPA claim need not be tied in any respect to a charge paid by a particular consumer). The Complaint demonstrates how the RESPA claim will be evidenced not by individualized facts of each transaction, but by Home Point's pattern and practice of receiving things of value from All Star and, in return, assigning and referring Home Point loans to All Star. This evidence— presented from the communications between in Home Point and All Star, in their own words—is the essence of class-wide proof that supports a finding of predominance. *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 340 (D. Md. 2012) (citing *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008)) (common issues predominate when plaintiffs "demonstrate that the element[s] of [the legal claim are] capable of proof at trial through evidence that is common to the class rather than individual[s]."). As such, the common factual issues—the existence of kickback agreements, the assignment and referral of loans pursuant to those agreements, the payment by All Star, and the receipt of a thing of value by Home Point— predominate over the identification of any specific kickback related to any specific Home Point Class member's loan. *Fangman*, 2016 U.S. Dist. LEXIS 154582, at *39.

The Home Point Class members' claims for fraudulent concealment tolling also involve similar common issues of fact and law because those concealments are alleged to be part of the workings of the Kickback Agreement, performed by Home Point with each class member in an identical manner and as part of Home Point's pattern and practice. This includes whether it was Home Point's regular practice to: (1) identify on borrowers "Good Faith" Estimate, HUD-1 settlement statements, or other loan documents the amounts charged borrowers to pay for kickbacks, or whether those amounts were false represented on loan documents as "title examination" or "title abstract"; (2) participate in and authorize the false allocation of fees that prevented borrowers from discovering the fraudulent and inflated nature of their title and settlement service charges; (3) receive and accept kickbacks in hard to trace forms, or launder the kickbacks through third party marketing companies; or (4) disclose the kickbacks or Home Point's coordinated relationship with All Star to borrowers.

The diligence required of each Class member is also a common factual issue because it will be determined by the objective standard of what is required of the reasonable residential mortgage borrower. *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 558 (4th Cir. 2019) (for fraudulent concealment tolling claims arising from RESPA kickback agreement, diligence is governed by that diligence expected of a reasonable residential mortgage borrower). The application of an objective standard creates a common question supporting class certification. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).

In cases involving RESPA claims and similar fraudulent concealment tolling allegations, courts have consistently found that these common issues predominate, and support class certification. *See, Edmondson*, 2020 U.S. Dist. LEXIS 89690, at *12–19; *Dobbins*, 2020 U.S. Dist. LEXIS 156315 at *7; *Bezek*, 2020 U.S. Dist. LEXIS 183174, at *17; *James*, 2020 U.S.

27

Dist. LEXIS 96633, at *25–28; *Fangman*, 2016 U.S. Dist. LEXIS 154582, at *40; *Palombaro*,

2017 U.S. Dist. LEXIS 127022, at *21–30.

Accordingly, the Home Point Class has met the commonality and predominance

requirements.

>    **6.    A class action is superior to other methods for fair and efficient adjudication of Home Point Class members' claims.**

The final condition of Rule 23(b)(3) requires that "a class action is superior to other

methods for fairly and efficiently adjudicating the controversy." The "superiority" prong is

"designed to ensure that the class action 'achieve[s] economies of time, effort, and expense, and

promote[s] . . . uniformity of decision as to persons similarly situated, without sacrificing

procedural fairness of bringing about other undesirable results.'" *Ginwright v. Exeter Fin. Corp.*,

280 F. Supp. 3d 674, 686 (D. Md. 2017) (quoting *Gunnells*, 348 F.3d at 424). In evaluating the

superiority of a proposed class action, courts consider four factors: (1) "the class members'

interests in individually controlling the prosecution or defense of separate actions"; (2) "the

extent and nature of any litigation concerning the controversy already begun by or against class

members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in

the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P.

23 (b)(3) (A-D). All four of these factors support class certification in this matter.

The Home Point Class is comprised of the borrowers on at least 444 Home Point loans.

The claims of all Home Point Class members are predicated on the same practice, pattern, and

course of conduct under Home Point's kickback agreement with All Star. Each individual Class

member's claim is tied to proof of this scheme and will necessarily involve overlapping

evidence, discovery, witnesses, and testimony. Litigating each claim separately would require

the parties to produce hundreds of virtually identical sets of discovery. Moreover, judges would

rule on similar evidentiary and pre-trial issues, and juries would hear virtually identical claims under RESPA, creating the likelihood of inconsistent rulings and judgments with respect to virtually identical claims. Litigating each claim separately carries obvious inefficiencies, runs the risk of separate and inconsistent judgments, and undermines judicial economy.

No Class member has an individualized interest in damages that would be better served by a separate action; for most, the amount of recoverable damages would not justify bringing an individual claim. In this case, the class action is superior precisely because it provides the economic justification for pursuing all claims. Plaintiffs are not aware of any other litigation against Home Point involving the same claims.

Finally, there will be virtually no difficulties in class management. The Home Point Class has been identified from All Star's loan processing data and Home Point's loan records which contain all identifying and contact information needed to provide notice. The Home Point Class is not unusually large; thus, it will not take exceptional effort to provide notice or manage discovery and the trial. The class action can be administered efficiently and fairly for each Class member and poses no unique managerial challenge.

## IV.    Conclusion

For the foregoing reasons, Plaintiffs have satisfied all of the requirements for certification under Rule 23 of the Federal Rules of Civil Procedure and respectfully move this Court to certify this matter as a class action and the proposed Home Point Class.


[SIGNATURES ON FOLLOWING PAGE]

Dated: January 21, 2022

Respectfully submitted,

_____/s/_____

Michael Paul Smith, Esq. #23685
Melissa L. English, Esq. #19864
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, Maryland 21204
(410) 821-0070 / (410) 821-0071 (fax)
Email: mpsmith@sgs-law.com
Email: menglish@sgs-law.com
*Counsel for Plaintiffs*

_____/s/_____

Timothy F. Maloney, Esq. #03381
Drew B. LaFramboise, Esq. #20288
Samuel P. Morse, Esq. #21955
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
(301) 220-2200 / (301) 220-1214 (fax)
Email: tmaloney@jgllaw.com
Email: dlaframboise@jgllaw.com
Email: smorse@jgllaw.com
*Co-Counsel for Plaintiff*